**COMMERCIAL FEDERAL BANK, F.S.B., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–472C.

United States Court of Federal Claims.

Jan. 22, 2004.

Alex Blanton, Washington, D.C., attorney of record for plaintiff and Edward L. Lublin, Lawrence Sher, Paul Honigberg and Katia Fano, of counsel, Washington, D.C.

Joanne Johnson, Department of Justice, Washington, D.C., and Ashley N. Bailey, Delfa Castillo, David C. Hoffman, Jeffrey T. Infelise, Ann Loughlin and Marc S. Sacks, of counsel, with whom was Deputy Assistant Attorney General Stuart E. Schiffer, for defendant. David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director.

## *OPINION*

FUTEY, Judge.

This *Winstar*-related case comes before the court following a trial on damages, held June 23, 2003, through July 25, 2003. Pursuant to a June 6, 2002, telephonic conference concerning joint stipulations made by the parties, the court held on summary judgment that defendant breached an Assistance Agreement (Agreement) with plaintiff to count an intangible asset known as "supervisory goodwill," acquired as a result of the Agreement, as part of plaintiff's capital and to allow amortization of that goodwill for 25 years.[1] Post-trial briefs have been filed and oral argument on those briefs was held October 23, 2003.

Plaintiff argues that as a result of the breach, it is entitled to recover expectancy damages to place it in as good a position as it would have been in, and to receive the benefit of the Agreement struck with defendant, had defendant not breached. Two theories of recovery are offered. First, plaintiff argues that it is entitled to profits allegedly lost due to the breach, measured by the difference between plaintiff's actual profits and an amount that would have been realized but for the breach, as estimated by experts on the basis of plaintiff's past and subsequent profits. In the alternative, plaintiff contends that the least it is entitled to receive is the value of the supervisory goodwill eliminated by the breach, which it argues can be measured by estimating the cost of replacing the intangible capital held in the form of supervisory goodwill with tangible capital. This estimate was offered at trial by plaintiff's expert in the form a hypothetical preferred stock replacement model that purported to represent the value of the lost capital from

the date of the breach through the date of trial.

Defendant counters, however, that both models should be rejected and that the amount of damages suffered by plaintiff by the breach was zero. It argues that plaintiff cannot show causation between the breach and its alleged lost profits, nor that the damages were foreseeable in either amount or type. Further, defendant asserts that the lost profits alleged are speculative and cannot be calculated with the reasonable certainty necessary to maintain a judgment. Defendant also contends that plaintiff failed to make any effort at mitigation and, therefore, forfeits its lost profits claim. Finally, defendant notes that hypothetical preferred stock replacement models have been routinely rejected by the United States Court of Federal Claims (Court of Federal Claims) and argues that plaintiff's replacement model should, therefore, be rejected as a matter of law.

### *Factual Background*

Commercial Federal Bank, FSB (Commercial), plaintiff, is the successor in interest to Mid–Continent Federal Savings and Loan (Mid–Continent). The present dispute involves actions and agreements between defendant and Mid–Continent, which until 1994 was a chartered mutual savings and loan association operating in El Dorado, Kansas. In 1994, its charter was converted to a stock savings institution and in 1998 Mid–Continent merged with Commercial.

In August 1986, plaintiff entered into an agreement with the Federal Savings and Loan Insurance Corporation (FSLIC) to acquire Reserve Savings (Reserve), in Wichita, Kansas. Reserve was an insolvent institution under the control of the FSLIC. In 1985, the FSLIC entered into a management agreement with plaintiff whereby plaintiff would manage the day-to-day operations of Reserve. Through that relationship, plaintiff's board and management team came to understand Reserve's business and became interested in acquiring Reserve for itself if a profitable transaction could be arranged. A bid for Reserve was submitted by plaintiff,

1. *Mid–Continent v. United States,* No. 95–472 (Fed.Cl., filed June 7, 2002).

which ultimately resulted in the August 1986 Agreement.

The Agreement between plaintiff and defendant called for the FSLIC and the Federal Home Loan Bank Board (FHLBB) to provide financial assistance and capital and accounting forbearance to plaintiff. To provide context, this transaction arose out of the savings and loan debacle of the 1980s, the relevant facts of which are clearly laid out by the United States Supreme Court (Supreme Court) in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In short, at the time this and many other assistance agreements were bargained for between the government and financial institutions, it appeared imminent that the FSLIC, which bore responsibility for indemnifying depositors against losses resulting from savings and loan insolvency, was likely itself to become insolvent. The savings and loan industry was in such a state that if the number of savings and loans failed as were projected by economists, investors, and legislators, the assets of the FSLIC would simply have been too few to cover the overwhelming claims by depositors. Various agencies of the government were tasked, therefore, to forestall that crisis by finding ways to encourage healthy financial institutions to buy, merge with, or otherwise take over the insolvent ones. *Id.* at 847–48, 116 S.Ct. 2432. In the present case, the encouragement came in the form of the Agreement, which can be summarized as:

1. A cash payment of $7,896,000, equal to Reserve's negative net worth on the date of acquisition.

2. Accounting and regulatory forbearance, such that plaintiff could credit the cash payment to its own "regulatory net worth," despite the fact that such treatment did not accord with Generally Accepted Accounting Principles. The $7,896,000 plus other intangible assets and adjustments after an audit, for a total of $9,245,000, could be counted as "supervisory goodwill,"

which was to be amortized over a 25-year period and accreted to income.[2]

3. Covered loss assistance, by which the FSLIC agreed to share losses with plaintiff and indemnify plaintiff above a "capped amount" on certain Reserve assets, such as high-risk loans made against mobile homes, including some suspected to have been made under fraudulent circumstances. In addition, plaintiff agreed to provide a "yield subsidy" on covered assets, and reimburse certain expenses related to the management and disposition of the covered assets.

At trial, the court heard extensive testimony regarding the history of Mid–Continent. Much of that history was told by Mr. Richard Pottorff and Mr. Larry Goddard, who served, respectively, as CEO and Executive Vice President continuously from 1978 until 1998. In 1978 Mid–Continent was a small, undercapitalized, unprofitable savings and loan with $48,000,000 in assets and approximately $1,000,000 in capital, and under a supervisory agreement from the FHLBB. It was, according to Mr. Pottorff, a "troubled association." [3]

Under the management team lead by Mr. Pottorff, Mid–Continent engaged in a strategy of growing its overall assets while disposing of nonperforming ones. In its first year, the association stemmed its historical losses and began producing a modest profit. By 1986, the association had grown to $178,000,000 in assets, more than tripling in size, meeting all regulatory capital requirements, and showing steadily but rapidly increased profits from just over $1,000 in 1980 to nearly $1,900,000 in 1986, the year the Agreement was signed. There was not a single year prior to the Agreement that, under the leadership of Mr. Pottorff and Mr. Goddard, plaintiff failed to grow its assets or build its capital, both of which were used to generate profits for the institution. This pattern of growth in assets, capital, and profits was repeated year in and year out, through

---

2. An adjustment after the agreement led plaintiff to write down its supervisory goodwill to $8,974,000. See Defendant's Exhibit (DX) 648.

3. Trial Transcript (Tr.) at 542.

periods of high and low interest rates, including periods of economic recession and boom.

As plaintiff contemplated acquiring Reserve, its stated goal was to use the assistance provided through the Agreement to leverage the combined institutions assets to $300,000,000 by 1990.[4] Although the parties dispute the importance of the various sources of plaintiff's growth after acquiring Reserve, by all accounts, plaintiff did continue its longstanding pattern of profitable growth. By 1987, its total assets had expanded to $196,000,000, then to $200,000,000 by the end of 1987, and $268,000,000 in 1988. At its height in June 1989, plaintiff had assets of $277,000,000 and total capital of nearly $18,000,000.. Despite such rapid growth, plaintiff considered itself a relatively conservative institution, which was reflected in its regulatory capital ratio at the end of this period of growth of approximately 6.8 percent of total assets. The institution was profitable during this entire period and its capital exceeded the well capitalized standard established by the Office of Thrift Supervision (OTS). In addition, plaintiff received a "composite rating" of 2 on a 5 point scale with 1 being the highest, by the FHLBB. Such a rating indicates that an institution is fundamentally sound, but may reflect modest weaknesses correctable in the normal course of business.[5]

On August 9, 1989, however, the Financial Institutions Reform and Recovery Act (FIRREA), Pub.L. No. 101–73, 103 Stat. 183, was enacted. Pursuant to FIRREA, the OTS promulgated regulations establishing new capital requirements for thrifts. The new standards required the institutions to have (1) tangible capital equal to 1.5 percent of total assets; (2) core capital equal to 3 percent of adjusted total assets; and (3) a risk-based capital equal to 6.4 percent of risk-weighted assets, stepping up to 8 percent by 1993. Most importantly in the *Winstar*-related litigation context, FIRREA eliminated supervisory goodwill immediately for the purposes of calculating tangible capital, notwithstanding the Agreement, and continued

to allow the inclusion of a declining amount of supervisory goodwill (phased out to zero over a 5–year period) in the calculation and reporting of core and risk-based capital.

The new regulations had the effect of substantially reducing plaintiff's regulatory capital. Allegedly in response to these regulations, plaintiff began what it calls a "shrink strategy" to maintain its capital ratios and avoid the risk of supervisory oversight by the OTS in the event of further regulatory pressure. There are two obvious alternatives for any institution seeking to raise its capital ratios. First, it can raise additional capital so that the ratio of capital to assets is likewise raised. In the alternative, an institution can maintain its existing capital base while disposing of assets, which raises the capital ratio by "shrinking" the firm's asset base. This latter option describes plaintiff's actions to implement the "shrink strategy."

Plaintiff became aware of FIRREA's impending enactment in early 1989 and its intention to pursue a shrink strategy is noted in the minutes of a meeting of its Asset/Liability Committee (ALCO) on July 5, 1989. The minutes state:

> Although the Association now can meet the 3% requirement by using the supervisory goodwill and phasing it out over a 5 year term. We feel that it is imperative that we meet the 3% hard core capital as soon as possible without the goodwill. To achieve this we are taking the position of not only no-growth, but of shrinking the Association from approximately $269,000,000 to $255,000,000.[6]

In fact, the thrift continued its shrink strategy for approximately four years, reducing assets each year to a low of $166,000,000 on September 30, 1993. Whether this strategy was in fact caused by the breach is a major point of contention by defendant.

In 1994, Mid–Continent converted from a mutual association to a stock chartered thrift, raising $21,700,000 in net capital through the sale of stock. Coinciding with the conversion, plaintiff abandoned its shrink strategy

---

4. See Plaintiff's Exhibit (PX) 81.

5. See PX 78.

6. See PX 213.

and renewed its history of rapid growth. During the next three years, plaintiff's assets grew to approximately $405,000,000 by the end of the 1997 fiscal year. The bank was increasing profits year to year during this period through a combination of normal loan activity as well as expanded loan servicing, which reached nearly $1.3 billion in loans serviced in 1997. In 1998, Mid–Continent was merged with the much larger Commercial.

## Discussion

### I. Lost Profits

Plaintiff's fundamental claim with respect to lost profits is that defendant breached its promise to permit the use of supervisory goodwill in its calculation of regulatory capital, and that such breach caused them to forgo investment opportunities to leverage that capital. Had the bank held more assets, it is alleged that more profits would have been earned.

Defendant argues that the record shows no investment opportunities were foregone as a result of diminished regulatory capital. It was, rather, independent and superceding business decisions that led plaintiff to engage in its shrink strategy. The core of defendant's counter argument on lost profits rests on the following premises: First, that plaintiff never fell out of capital compliance after FIRREA, nor was it subject to a supervisory agreement, capital plan, or other legally enforced order to shrink imposed by regulators. Second, regulators did not require that Mid–Continent sell its assets or forego additional investment opportunities. Third, in actual practice, Mid–Continent did not raise capital to replace its goodwill, which defendant argues would have been attempted if the capital had the value plaintiff now claims. Last, rather than take advantage of the 5–year phase-out provision permitted by FIRREA, plaintiff wrote-off the majority of its goodwill in advance of the phase-out.

■ A lost profits damages award is one way the law can make a non-breaching party whole, by giving the party the benefits it may have expected from an agreement had the breach not occurred. *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380

(Fed.Cir.2001). Lost profits may be recovered where plaintiff establishes by a preponderance of the evidence that (1) the loss was the proximate result of the breach; (2) the lost profits were foreseeable; and (3) a sufficient basis exists for estimating those lost profits with reasonable certainty. *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324–25 (Fed.Cir.2002); *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349–50 (Fed.Cir.2001).

Plaintiff claims a total of $17,905,000 in lost profit damages. It is useful for the purposes of analysis to break plaintiff's damages claim into three distinct periods of time. During the period July 1989 to June 1994, which covers the date of FIRREA's enactment through the time Mid–Continent converted to a stock charter, plaintiff claims $5,817,000 in damages. An additional $8,018,000 in damages are claimed during the period July 1994 through September 1997, which runs from the date of its stock charter conversion until Mid–Continent was merged with plaintiff. Finally, $4,070,000 is claimed for the period October 1997 through August 2011, the period between the merger and the last year of goodwill amortization provided under the Agreement.

### A. Causation and Damages

To support its claim for lost profits, plaintiff's expert Dr. Donald M. Kaplan offers a model which assumes that, but for the breach, plaintiff would have been able to grow its assets at an annual rate of 10 percent from July 1989 to June 1994 and that those assets would have produced an average return of one percent for the period. Although no further growth in assets is assumed beyond 1994, this one percent return on assets (ROA) is assumed to continue accruing on the "but-for" assets through September 1997. For the period from 1998 to 2011, Dr. Kaplan extrapolates plaintiff's profits based on its actual earnings through fiscal year 1994, looking to the percentage of plaintiff's actual asset pool to determine what proportion of the "but-for" assets would be leveraged and earning profits through 2011.

### 1. July 1989 to June 1994

■ Plaintiff intended to grow to "300 million [dollars in assets] before the end of September of 1990," in part on the basis of the capital received through the Agreement.[7] From the date of the Agreement until several months before FIRREA was enacted, plaintiff did, in fact, profitably grow its assets at a rate of nearly 25 percent per year, to $269,000,000. Plaintiff presented evidence and expert testimony alleging that, but for the breach, this trend of profitable growth would have continued until the present day. The actual history of the bank demonstrated that once plaintiff converted to a stock chartered institution, infusing it with significant new capital, it shortly thereafter reversed a pattern of shrinking, corresponding closely to the period of FIRREA's enactment and ending at the time of conversion. Plaintiff exhibited an average annual growth rate of more than 25 percent until merging with Commercial. In fact, plaintiff had an average annual asset growth rate of nearly 20 percent from the day Mr. Pottorff took over Mid–Continent as CEO until the date of the breach. On the strength of this history, the court found Mr. Pottorff highly credible in his testimony that "we were able to grow our association almost whenever we had the right capital to do it with." [8]

In *Wells Fargo Bank v. United States*, 88 F.3d 1012 (Fed.Cir.1996), the United States Court of Appeals for the Federal Circuit (Federal Circuit) quoted approvingly a "distinction by which" lost profit may be said to have been caused by a breach:

> If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement .... But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principle contract, then they are too uncertain and remote to be taken into consider-

ation as a part of the damages occasioned by the breach of the contract in suit.

*Id.* at 1022–23 (quoting *Myerle v. United States*, 33 Ct.Cl. 1, 26, 1800 WL 2024 (1897)).

*Wells Fargo* was a case in which the government failed to honor certain loan guarantees. As a result, plaintiff was generally unable to undertake a certain class of loan activities. After trial, the Court of Federal Claims "awarded damages for the profits Wells Fargo allegedly would have made on the additional loans it could have made" had there been no breach. *Wells Fargo*, 88 F.3d at 1023. On appeal the Federal Circuit reversed, however, stating that these loans were "too uncertain and remote to be taken into consideration as part of the damages occasioned by the breach of the contract in suit." *Id.* (citation omitted).

Although defendant argues this standard as decisively in its favor, the Federal Circuit stated in *Cal. Fed.*, 245 F.3d at 1349, that "[t]he continued use of supervisory goodwill as regulatory capital for the entire 35–40 year amortization period initially promised was ... a central focus of the contract and the subject of the government's breach. Profits on the use of the subject of the contract itself, here supervisory goodwill as regulatory capital, are recoverable as damages."

While *Wells Fargo* provides the principle by which causation for lost profits is judged, *Cal. Fed.* is an important guide to its application in the *Winstar* context. The central focus of the Agreement was the salvaging of an unhealthy financial institution by means of purchase or merger with the healthy Mid–Continent. The object of both defendant and plaintiff was to use a mix of immediate cash assistance plus regulatory capital to generate the profits necessary to restore health to Reserve. Although that profit was to be made on "collateral undertakings," such as mortgage loan activity, these profits were the result of the "use of the subject of the contract itself." The court holds that it is proper to consider alleged lost profits from the

---

7. Tr. at 178.

8. *Id.* at 559.

use of the promised supervisory goodwill as part of plaintiff's damages.

Defendant argued, however, that even if FIRREA was a cause of plaintiff's lost profits, there are other substantial factors that contribute and eliminate or diminish defendant's liability. The court will next address the following substantial factors argued by defendant: plaintiff's failure to take full advantage of the FIRREA provision allowing for a five-year phase out of supervisory goodwill; the fact that plaintiff never fell below the FIRREA standard for capital compliance; and various financial and macro-economic conditions affecting plaintiff's business. As a result of these alleged substantial factors contributing to plaintiff's loss, defendant argues that any harm suffered cannot be considered the natural result of the breach.

### a. Plaintiff's Disregard of the Phase-Out Provision

■ Although FIRREA completely eliminated the use of supervisory goodwill in the calculation of tangible capital, it permitted a declining balance of goodwill to be used in the calculation of "core" and "risk-based" capital.[9] Defendant argues that had plaintiff taken advantage of the substitute performance it was offering, a five-year phase out rather than a 25-year amortization of goodwill, it would have softened FIRREA's blow. Nevertheless, plaintiff made the decision to write-off the entire supervisory goodwill. By taking advantage of the phase-out provision, plaintiff would have remained above all of the new capital requirements mandated by FIRREA. Defendant alleges that the write-off is proof that during this period the supervisory goodwill had no economic value to plaintiff.

Plaintiff denies that this decision was voluntary and both sides presented documentary evidence to support their positions. Plaintiff produced an August 10, 1989, letter from the OTS informing Mid-Continent that because "the current level of GAAP capital of

2.6 percent fails to meet the regulatory capital requirement, the board should consider alternative sources of recapitalization to assure compliance with future regulatory capital requirements."[10] Plaintiff wrote to the OTS for clarification, noting that it was entitled to phase out the supervisory goodwill over a 5-year period. OTS further informed plaintiff, however, that it "believe[d] you will fail one or more of the capital requirements imposed on December 7, 1989."[11] These statements would not have been true had the OTS calculated plaintiff's capital ratios according to the 5-year phase-out provision.

In response, plaintiff wrote an appeal to OTS including an attachment of relevant portions of the Agreement, stating that it was permitted to use supervisory goodwill in calculating its capital ratios.[12] Nevertheless, on December 18, 1989, the Topeka branch of the OTS wrote that it was under direction from its Washington headquarters "to exclude accounting forbearances, or more specifically in your situation, the Federal Savings and Loan Insurance Corporation Capital Contribution from the core capital calculation."[13] According to plaintiff, on the basis of this instruction, it reduced tangible assets in order to raise its core capital ratio to 3.01 percent, just above the regulatory minimum, without the benefit of supervisory goodwill.[14]

Defendant demonstrated at trial that the December 18, 1989, letter received by plaintiff was in fact a variation of a form letter sent to all thrifts during that time. Thrift Bulletin 38-2, by contrast, which Mr. Pottorff acknowledged as being an authoritative communication of the type he was generally responsible for reviewing, instructed that FSLIC capital contributions leading to supervisory goodwill are valid under the new regulation. The court finds, however, plaintiff's interpretation of this contradictory series of communication reasonable: that, as applied to plaintiff, FIRREA required a 3

---

9. See 12 C.F.R. §§ 567.1(w)(1) and 567.5(a)(2)(iii)(B).

10. See PX 14.

11. See PX 114.

12. See PX 115.

13. See PX 116.

14. See PX 118.

percent capital ratio apart from the supervisory goodwill promised by the Agreement.

The circumstance was not as urgent, perhaps, as that in *LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363 (Fed.Cir. 2003), where "the OTS informed [plaintiff] ... that to avoid closure it would have to achieve full capital compliance ... two years ahead of the date set in the 1990 capital compliance plan." *Id.* at 1368. The court does not believe, however, that plaintiff was unreasonable in understanding that FIRREA regulations, as implemented in its case, required the complete elimination of supervisory goodwill in the first year. This is not to suggest that defendant is liable for damages because it provided bad legal advice to plaintiff. Rather, it is taken only to undermine defendant's assertion that the decision to write off all goodwill early supports the proposition that the goodwill was valueless. Plaintiff's letter to the OTS seeking clarification indicates its intent to use the goodwill phase-out if possible. The fact that plaintiff did write off the goodwill, therefore, does not break the chain of causation.

### b. Plaintiff Was Not Forced Out of Capital Compliance

█ Defendant argued at trial that since plaintiff never fell below the regulatory capital minimums necessary after FIRREA, it was not harmed. If plaintiff failed to leverage its capital to the point of its regulatory limit, the argument continues, any profits thereby forgone were the result of independent business decisions and not the breach.

Although it is true that plaintiff never fell below the regulatory capital minimums, at least in the earliest years of this period, it can be attributed to plaintiff's fast efforts to shrink the institution's total assets. As noted above, even defendant admitted that without the supervisory goodwill, plaintiff's tangible capital ratio in the months leading up to FIRREA's enactment was 2.6 percent, or .4 percent below the proposed regulatory minimum. It was the foresight of the ALCO committee, which determined in advance of FIRREA's enactment, that the most prudent response to the uncertainties of FIRREA's implementation was the shrink strategy. Due to that strategy, by the time FIRREA was implemented plaintiff had a core capital ratio of 3.01 percent without supervisory goodwill, or slightly above the regulatory minimum.

In any event, the court's comments in *Home Sav. of America, FSB v. United States*, 57 Fed.Cl. 694 (2003), are persuasively applied in the present circumstance. It was stated there that "even if it is true that Home Savings' regulatory capital ... was greater than the amount minimally necessary to maintain its mandatory core capital ... this does not prove that Home Savings was not injured by the loss of supervisory goodwill." *Id.* at 721. Further, the court affirmed that a thrift is "entitled to manage its capital conservatively, maintaining a cushion ... adequate to protect against the vagaries of the market." *Id.*

The facts of *Home Savings* were different from this case, but the court finds the principle persuasive here. There is a significant risk in operating too close to the regulatory minimums, which was described not only by plaintiff's expert Dr. Kaplan, but also acknowledged by defendant's expert Mr. Frederic Forster.[15] In light of contradictory signals from the OTS, the government's repudiation of vital contract provisions, and the knowledge that other institutions had been seized for falling below the new capital requirements, it is no mystery why plaintiff would seek a conservative capital cushion during this period. The fact that plaintiff did not leverage its capital up to the point of bare minimum regulatory compliance is not evidence that the breaching provisions of FIRREA caused no harm. A capital ratio out of proportion to industry standards for conservatively run institutions might lead the court to a different conclusion, but that was not the case during the 1989 to 1994 period.

### c. Allegedly "Non–Breach" Factors

█ Defendant argues that Dr. Kaplan's lost profits model ignores a number of allegedly "non-breach" factors leading to plain-

**15.** Tr. at 2494.

tiff's shrink strategy. These factors include a rescissionary economy from 1990–93, changes in plaintiff's business activities, including the loss of a profitable student loan program, non-breach related business concerns about interest rate risk, the disposition of "covered assets," and changes in the competitive environment for thrifts, both nationally and in Kansas.

Defendant argued throughout the trial that Dr. Kaplan's model was unreliable and too simplistic to account for lost profits because it did not account for the fact that the United States and Kansas economies were less robust between 1990–93 than in periods preceding and following. In fact, Dr. Kaplan acknowledged the downturn during cross-examination [16] as did Mr. Pottorff, including the fact that any economic downturn could lead to an adverse affect on plaintiff's profits.[17] Plaintiff argued, however, that Dr. Kaplan's model accommodated these facts by assuming rates of asset growth and profitability significantly smaller than the actual performance demonstrated by plaintiff in the pre-breach and post-breach periods.

Similarly, defendant argued that new sources of competition during the breach period were a cause of plaintiff's asset shrinkage. On cross-examination Mr. Pottorff admitted that an increase in competition "is independent of FIRREA" and that competition may have adverse affects on the growth and profitability of a thrift.[18] Nevertheless, as defendant's expert Mr. Forster acknowledged, the competitive factors cited by defendant were similar not only during the breach period, but also for some time prior and after breach.[19] On the subjects of competition and general economic conditions, the court finds defendant's criticism of Dr. Kaplan's model unpersuasive. It is true that competition and economic conditions can affect the profitability of a business, but that is true not only during the period of breach but also before and after. Throughout the entire history of plaintiff's operations it faced changing economic conditions, including deep recession during the early 1980s, and yet it experienced profitable growth placing it as one of the top performing Kansas thrifts. As described by defendant's primary expert, Dr. Mukesh Bajaj, increased competition from commercial banks and loan origination by non-banking institutions surely would have challenged plaintiff's operations with or without FIRREA. Nonetheless, the allegation that these factors, and not FIRREA's elimination of a massive portion of plaintiff's capital, were a substantial cause of plaintiff's shrink strategy was not credible. Defendant ignored the actual performance of plaintiff, demonstrating its capacity to weather, even thrive, in the face of pre-breach and post-breach economic and competitive challenges. To the extent that these factors did contribute to plaintiff's business plans, the court concludes that the conservative growth and profitability percentages applied by Dr. Kaplan compensate for them.

Defendant argues that plaintiff had significant interest rate risk concerns that required a restructuring of its balance sheet for non-breach, business reasons. In order to accomplish this restructuring, it is alleged plaintiff was forced to shrink its asset base. According to defendant, plaintiff's shrink strategy was therefore motivated and caused by plaintiff's business needs, wholly apart from the breaching provisions of FIRREA.

Defendant presented evidence, for instance, of plaintiff's policy to "restructure the entire portfolio of assets and liabilities of the Association" to minimize interest rate risk.[20] The key to managing interest rate risk for plaintiff was to replace low-yield, long-term assets, such as fixed-rate mortgages with adjustable rate or short-term assets. As a result, plaintiff expressed the need to sell off its fixed-rate mortgages in the secondary market [21] and work to originate and keep for its own portfolio more "adjustable rate mortgages; student loans; consumer loans; credit card loans; and some commercial lend-

---

16. *Id.* at 1403.

17. *Id.* at 764.

18. *Id.* at 736–37.

19. *Id.* at 2563.

20. See DX 650, at 2342.

21. Tr. at 272.

ing."[22] By 1992, however, the low interest rate environment made it difficult for plaintiff to originate these types of loans. As both Dr. Kaplan and Dr. Bajaj noted, consumers simply prefer fixed-rate mortgages when low interest rates prevail. During this period, plaintiff's adjustable rate mortgage origination was a small fraction of that projected by its business plan.[23] Defendant concludes, therefore, that although the management of interest rate risk demanded the origination of a high volume of adjustable rate loans, they were impossible to originate in such volume during this period, which was the actual cause of plaintiff's shrinkage.

Plaintiff argued, however, that the entire context of its operations during this period should be viewed in light of its shrink strategy. The alleged lack of availability of assets that would fit within plaintiff's but-for growth strategy was "short-lived and even then was indirectly caused by the breach."[24] Plaintiff argued that it could have generated such assets by offering incentives or other means to price loans below the national market price. If held for their own portfolio rather than sold in the secondary market, such loans could have been profitable. Plaintiff testified that it had employed such practices in the past, but that without sufficient capital "[t]he risk becomes too great . . . ."[25]

On the weight of the testimony offered, the court concludes that defendant often argued effects of the shrink strategy as that strategy's cause. The nearly 20 year history of plaintiff, combined with its business plans and actions to remain as profitable as possible during this period, convince the court that it would not have adopted a shrink strategy but for the elimination of supervisory goodwill by FIRREA. Defendant's conflation of cause with effect was particularly clear in its presentation of the final two non-breach factors: plaintiff's loss of a student loan program and the disposition of covered assets.

Plaintiff had a student loan business that generated a significant share of its profits in the years leading up to 1989.[26] In 1990, however, policy changes unrelated to FIRREA involving the guarantee of student loans caused plaintiff to leave this area of business. The natural result of ceasing this activity would have resulted in approximately $22,000,000 in asset shrinkage.[27] In addition, the Agreement indemnified plaintiff against losses on the disposition of certain assets received from Reserve. Plaintiff took full advantage of this provision by selling or otherwise disposing of those assets in the time allotted by the Agreement. The result of these dispositions was an approximate $7,200,000 reduction in assets.[28] Except when deliberately attempting to shrink, it is unlikely, however, that a thrift would dispose of assets without further action. Whether it was profitable to dispose of them as in the case of the covered assets, or whether they were disposed to avoid future losses as in the case of the student loans, once disposed, a business intent on growing seeks to replace those assets with profitable new acquisitions. This is the same way, for the same reasons, that any financial institution wishing to grow or remain stable in size continually originates or purchases new loans: as old mortgages are paid off, the institution's asset base naturally diminishes unless it constantly seeks new business. A question remains as to whether the new business it takes on will be profitable, but for defendant to hold that these dispositions stand as a substantial cause of the asset shrinkage suffered by plaintiff is to reverse cause and effect. But for the shrink strategy, plaintiff's intentions and history indicate that lost student loans and covered assets would have been replaced with new assets procured in the marketplace.[29]

22. See DX 650, at 2342–43.

23. See DX 298, at 1955.

24. Plaintiff's Post–Trial Brief (Pl.'s Br.) at 16.

25. Tr. at 642.

26. *Id.* at 712; DX 62, at 1702.

27. See PX 124, at 211.

28. See PX 122, at 19.

29. Defendant argued that Dr. Kaplan's alleged failure to consider non-breach factors for shrinkage vitiates the reliability of his model. The court notes *South. Nat'l Corp. v. United States*, 57 Fed.Cl. 294 (2003) and *Fifth Third Bank of West.*

Defendant argued that asset growth does not necessarily lead to additional profits. In fact, during the period in question that plaintiff's assets were shrinking, its net income was growing substantially.[30] In addition, Mr. Pottorff admitted that during the 1980s, while the thrift was experiencing rapid asset growth, its net income declined by as much as 50 percent in one year.[31] Although these facts are compelling, the court is convinced that during the period in question, with additional capital, plaintiff would have profitably leveraged it. The increase in net income during the period of breach was the result of a very successful strategy to increase fee income through such activities as mortgage servicing. This activity could have taken place at the same time the institution increased its asset base and loan origination activities, had capital been available. The court is persuaded that the converse relationship between assets and profits cited by defendant is an important consideration, but does not overcome plaintiff's record of profitable growth and average asset return in excess of one percent.

The weight of the testimony and evidence presented at trial leads the court to hold that plaintiff engaged in a shrink strategy as a direct consequence of FIRREA, and that the resulting depletion of plaintiff's assets deprived plaintiff of profits it would have earned in the but-for world. Throughout the wide range of economic conditions, interest rate environments, competitive challenges, and changes in its product mix, plaintiff achieved an asset growth rate of substantially more than Dr. Kaplan's assumption of 10 percent, on average during any two year period it was managed by the key personnel in place for more than a decade before, dur-

ing, and many years after FIRREA was enacted.

Likewise, the court finds credible Dr. Kaplan's one percent ROA assumption, leading to a $5,602,000 damages claim during this period. A one percent ROA is consistent with the average returns experienced by plaintiff between 1990–97, exclusive of gains on loan sales which would not likely be affected by FIRREA. One percent ROA is also significantly less than average returns experienced after 1994.[32]

On the basis of the evidence adduced at trial, including Dr. Kaplan's model and its criticism by defendant's experts, the court holds that during the period July 1989 to June 1994, the breaching provision of FIRREA resulted in lost profits of $5,602,000. This amount excludes the claim for "replacement income" which is discussed below.

In reaching this conclusion, the court is guided by the Federal Circuit's statement that "[t]he ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed.Cir.2001) (quoting *Elec. & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 416 F.2d 1345 (1969)).

A primary theme of defendant's case is that plaintiff has failed to offer evidence or provide a model of damages capable of quantifying them with reasonable certainty. Plaintiff has the burden to prove expectancy damages with "reasonable certainty." *Bluebonnet*, 266 F.3d at 1355. A damages claim

---

*Ohio v. United States*, 55 Fed.Cl. 223 (2003), which dismissed on summary judgment lost profits claims based on models suffering from such a deficiency. The actual performance of the institution during non-breach periods convinces the court, however, that Dr. Kaplan's asset growth and profitability assumptions are realistic and appropriate. In addition, unlike *South. Nat'l*, 57 Fed.Cl. at 306, in which the expert did "not attempt to ... identify[] types or categories of investment opportunities that [the institution] would have exploited," Mr. Pottorff and others testified about opportunities they believed existed

to purchase Resolution Trust Corporation assets, among others, during the period of breach had capital been available. See Tr. at 629–30 (Pottorff).

**30.** See DX 298, at 1950–51.

**31.** Tr. at 703–04.

**32.** See PX 124, PX 135, PX 147, PX 157, PX 175, PX 182, PX 190, and PX 197 (Plaintiff's Annual Reports and Audited Financial Statements).

may not be based on mere speculation. *Franklin Fed. Sav. Bank v. United States,* 55 Fed.Cl. 108 (2003). Nevertheless, "[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery ...." *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521 (1960).

Although plaintiff's model uses a process of projection, it is grounded in the actual performance of the bank both pre-FIRREA and post-conversion. Similarly to *Energy Capital,* 302 F.3d at 1329, the court "believe[s] this is a case in which" the court can properly "draw reasonable inferences based upon the evidence" about the likelihood that plaintiff would have earned profits in the amounts specified but for the breach. In establishing the fact of damages to the best of its ability, the court has made reasonable inferences based on the evidence. The court, therefore, embraces the principle that once this fact is established and "when damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *LaSalle Talman,* 317 F.3d at 1374.

The Federal Circuit has "also allowed so-called 'jury verdicts,' if there was clear proof of injury and there was no more reliable method for computing damages-but only where the evidence adduced was sufficient to enable a court or jury to make a fair and reasonable approximation." *Bluebonnet,* 266 F.3d at 1357.

The court has conducted a trial for more than a month, reviewed pre-breach business plans, thousands of pages of testimony and expert reports, economic data relating to thrifts, and particularly the Kansas market in which plaintiff operated, and listened to testimony of participants involved in the negotiation, implementation, and regulation of the terms of the Agreement. There is no doubt that plaintiff is entitled to $5,602,000 in lost profits damages. The court also believes, however, that under the jury verdict method, this amount would be a fair and reasonable approximation of the damages caused FIRREA.

### 2. July 1994 to September 1997

In June 1994, Mid-Continent converted to a stock chartered thrift from a mutual association. It raised approximately $21,700,000 in equity capital, leading to a core capital ratio of nearly 12 percent. In fact, in all of the years between 1994 and 1997 the post-conversion institution had a substantial margin of capital above the cushions contemplated by plaintiff's business plans. The testimony of Mr. Pottorff shows that plaintiff fared exceptionally well in the conversion process taking advantage of an opportunity to sell when it was able to garner a high price for its stock.[33]

Plaintiff has argued that no matter how much capital plaintiff raised, however, that amount is less capital than the post-conversion thrift would have had but for the breach. In other words, whatever capital plaintiff had was necessarily less than that amount plus its unamortized goodwill in the "but-for" world. Since all capital has a cost, the argument continues, the elimination of that capital was a harm despite the fact that plaintiff could be said to have "surplus capital," well above that necessary to meet regulatory requirements or management's targeted cushion.

Plaintiff states that "[i]t is absurd for the government to suggest that there are no damages after the conversion simply because Mid-Continent was 'flush with capital' and it did not fully leverage it."[34] By analogy, plaintiff suggests that "[t]his argument is equivalent to a debtor arguing that it should not be made to pay a $1,000 debt because the creditor has won the lottery, worth several million dollars, and now has no profitable use for the $1,000."[35]

The court finds that the analogy does not hold as a description of reality, but captures well plaintiff's misunderstanding of the value of goodwill. As experts for both parties testified, supervisory goodwill is not a tangible asset but an accounting fiction. It is a means of substituting an agreement with

**33.** Tr. at 634.

**34.** Pl.'s Br. at 27.

**35.** *Id.* at n. 19.

regulators for real assets in the calculation of regulatory capital. To say that it is an accounting fiction, however, is not pejorative and does not mean that it has no value. Its value, as many *Winstar*-related cases have shown, can be enormous. Nonetheless, its value is derivative. It has no inherent value such as $1,000 of cash does, as posited by plaintiff's analogy. If one takes away $1,000 cash, the victim has lost not only the cash but also the profitable opportunities to which the cash might have been put to use. By eliminating goodwill, however, only the uses for which the goodwill might have been employed are taken. If it can be shown that the goodwill would not or could not have been put to use under the actual circumstances by the institution, then despite there being a breach and a loss of goodwill, there is no harm.

The stock conversion in this case was facilitated through the use of a holding corporation, Mid–Continent Bancshares, Inc. The court finds it particularly noteworthy that after the conversion, more than $10,000,000 was invested in Mid–Continent by the holding company as a loan, rather than as equity capital.[36] If plaintiff could have leveraged the eliminated supervisory goodwill to buy profitable assets, the opportunity to use more than $10,000,000 of its investors' dollars in the form of equity capital rather than debt would have provided a substantial benefit. The form of this transaction, however, can only suggest that infusing plaintiff with that $10,000,000 in equity capital would have resulted in such a surplus of capital that much or all of it would have been idle or unproductive. In addition, plaintiff made nearly $5,390.000 in stock repurchases and paid out $2,343,000 in dividends during this period.[37]

If an institution's capital ratio is so high that it prefers to divest itself of capital when it has a very low-cost alternative, it implies that the firm has run out of profitable opportunities to invest that capital, and the value of supervisory goodwill is diminished to near zero. The value of goodwill is derived from the profitable uses to which an institution can put it. The court believes that this transaction is the equivalent of plaintiff declaring the goodwill to be worthless during the period from conversion to merger. The court finds contrary expert and fact witness testimony not credible. Losses must be measured by the performance value to "the injured party and not [the value] to some hypothetical reasonable person or on some market."[38] To the extent that the bank did have profitable opportunities to leverage all of its capital, up to and including the increment of capital labeled supervisory goodwill, it chose to do otherwise. Those choices may have been constrained by the business need to prudently invest the extraordinary level of capital raised by the stock conversion. Defendant should not be liable, however, for the non-use of supervisory goodwill due primarily to the institution's good fortune.

On this count, plaintiff argues that no institution can be expected to instantly absorb and prudently invest a massive infusion of capital, such as the one received during the conversion.[39] Indeed, it would be reckless for an institution to choose quantity of assets over their quality in an attempt to put its newly earned capital to productive use. Nevertheless, during the entire period from the stock conversion until the merger, plaintiff's actual history demonstrates that it was not able to leverage an amount near all of its tangible capital, let alone the increment of supervisory goodwill promised in the Agreement.

In its post-trial brief plaintiff seeks to clarify its position on damages in this period. Its claim does not "include any further 'but for' growth *after* the conversion. Rather, it assumes that the $220 million in assets that Mid–Continent would have acquired in the 1989–1994 period but for the breach would have continued earning ... an ROA of one percent after the conversion."[40] This argument, however, is not convincing. As was

---

**36.** Tr. at 698; See PX 182 and PX 195.

**37.** See DX 741.

**38.** Restatement on Contracts (Second) § 347, cmt. b (1981).

**39.** Tr. at 186.

**40.** Plaintiff's Reply to Defendant's Post–Trial Brief at 6.

made clear during testimony with respect to its mortgage loan origination and student loan business in the 1989–94 period, assets continually have to be replaced in a thrift's portfolio. For example, mortgages amortize over time, student loans are paid off, and assets are written off for various reasons. Due to the fact that a thrift's asset balance is always naturally declining, it is incumbent on the institution to continually refill its portfolio with new assets. In this period, plaintiff was unable to take full advantage of the capital it had on hand. If the full $220,000,000 in "but-for" assets had been a part of the post-conversion bank, plaintiff may well have simply reduced further the amount of equity capital it infused into the merged bank, returning more of the capital raised through the stock sale to investors through dividends or repurchases. Under any circumstances, there was no evidence or reason persuasive to the court to believe that plaintiff would have continued to earn a one percent ROA on the $220,000,000 of "but-for" assets *in addition* to what it did earn on its actual assets for this period. The court concludes, therefore, that the elimination of the supervisory goodwill caused no actual harm in the period from July 1994 to September 1997.

### 3. October 1997 to August 2011

 Plaintiff's claim for $4,070,000 in lost profits from October 1997 to August 2011 is based on the calculation that at the end of the accounting period prior to Commercial's acquisition of Mid–Continent, there would have been $4,978,000 in unamortized goodwill but for the breach. Dr. Kaplan's model assumes that all of that goodwill would have become a part of plaintiff's larger capital pool at the time of the merger.[41] The model proceeds then to calculate lost profits on the assumption that this $4,978,000 in supervisory goodwill would have been leveraged by plaintiff in the same way, to purchase the same types of assets, using plaintiff's actual leverage ratio for the period of October 1997 to September 2000. Plaintiff argues that "[h]owever small the unamortized goodwill

balance would have been, ignoring damages during this period would imply that goodwill had no value and thus would run contrary to the Supreme Court's *Winstar* decision. No matter how much capital [plaintiff] had, it would have had approximately $4.978 million more but for the breach."[42] This principle that "[a]ll capital raised by a corporation has a cost," is a true and familiar one. *LaSalle Talman*, 317 F.3d at 1375.

Nevertheless, as noted above, supervisory goodwill is a strange breed of capital. It is not a normal asset, but an accounting rule, which creates value primarily by allowing a bank to operate closer to insolvency than would otherwise be permitted by regulation. As a result, supervisory goodwill has a diminishing marginal utility as an institution's capital ratio increases. If the institution is near or below the regulatory minimums, it may be seized or fail without its supervisory goodwill. When it has capital well above regulatory reserves, and well above the capital cushion at which the thrift's management has historically chosen to operate, the value of supervisory goodwill as a form of capital is significantly diminished. Where the institution's capital cushion is so far above the regulatory minimums as to be insulated from virtually any unexpected market or regulatory change, eliminating the goodwill from the institution's portfolio may diminish its capital, but it cannot be said to be harmful. Unlike tangible capital, the supervisory goodwill could not be used for any purpose other than shoring up its capital ratio against regulatory pressure.

After the merger, plaintiff had nearly $130,000,000 of capital cushion before it approached even the "well-capitalized" standard established by the government.[43] Further, between 1997 and 2001, plaintiff repurchased nearly $418,000,000 of its own stock in market transactions. The repurchase of stock by the company has the effect of "giving back" capital to its investors. Although Dr. Kaplan testified that reasons exist, such as a desire to attract dividend seeking investors, for an institution's choice

---

**41.** See PX 55A.

**42.** Pl.'s Br. at 29 n. 21.

**43.** See DX 472, at 2798.

to return capital to its investors, defendant is not liable for such business decisions. The court finds persuasive the analysis of defendant's expert Dr. Bajaj, to the effect that these purchases are tantamount to an admission that plaintiff simply had no need for this capital or, at least, that the institution had no means or options for investing the capital profitably.[44]

Due to its nature, any supervisory goodwill plaintiff would have had from the merger with Mid–Continent would have been the last increment of capital leveraged by plaintiff. Plaintiff's post-merger history of stock repurchases, dividend payments, and capital surpluses well above conservative capital cushion levels shows that this last increment of capital would not likely be leveraged by plaintiff and, therefore, that FIRREA was not the source of a continuing financial harm to plaintiff in the post-merger era. Damages claimed for this period are too remote to be considered a proximate result of the breaching provisions of FIRREA.

In addition, although plaintiff argued that all the financial data needed for calculating lost profits for this final period of the contract is contained in SEC reports, *no fact witnesses concerning this time period were presented at trial.* The court holds, therefore, that defendant is not liable for any alleged damage in the October 1997 to August 2011 time period.

### B. *Foreseeability*

■ Next, defendant claims that it was not "reasonably foreseeable that plaintiff would be harmed by the elimination of goodwill from regulatory capital ...."[45] The court rejects this premise and holds that it was foreseeable that as a result of the elimination of goodwill from regulatory capital, plaintiff would need either to replace the supervisory goodwill with another form of capital or shrink its assets to maintain its capital cushion, in order to be as well off as it would have been had the Agreement been fully performed. These consequences were not only foreseeable, they were a basic reason for the

enactment of the breaching provisions of FIRREA.

As the Supreme Court found, FIRREA "not only had the purpose of eliminating the very accounting gimmicks that acquiring thrifts had been promised, but the specific object of abrogating enough of the acquisition contracts as to make that consequence of the legislation a focal point of the congressional debate." *Winstar,* 518 U.S. at 900, 116 S.Ct. 2432.

The court notes that a similar argument arose in *Cal. Fed. v. United States,* 54 Fed. Cl. 704 (2002). In *Cal. Fed.,* the court stated that the government " 'knew that [CalFed] would have to reduce its assets or increase its capital' ... but that it does not follow logically" that defendant could thereby see the "effect this adjustment would have on plaintiff's profits." *Id.* at 714 (internal citations omitted). Defendant repeated that argument at trial in the present case. This argument is supported with the evidence that at times, even during the period of shrinking, plaintiff was able to increase its net profits over previous periods. For example, from 1990 to 1991 plaintiff's assets were reduced from approximately $230,000,000 to approximately $213,000,000. At the same time, its net profits rose considerably, from $146,000 to $657,000.[46] Aside from some adjustment that might be warranted due to the timing involved in accounting for certain losses or gains in one year or the next, defendant's point remains: it is not necessarily the case that a reduction of assets leads to a reduction of profit. Defendant asserts that even if plaintiff could foresee that the breach would cause a need to raise capital or reduce assets, it would not necessarily foresee harm in the form of reduced net profit.

The court, however, finds this argument unpersuasive. To begin, it is a part of the definition of a savings and loan institution to make a business of leveraging capital to create a portfolio of profitable assets. Defendant could easily foresee that one consequence of its breach could be a decline in

---

44. Tr. at 2866.

45. Defendant's Post–Trial Brief (Def.'s Br.) at 39.

46. See DX 298, at 1950–51.

plaintiff's asset base, which is used for no other purpose than the generation of profits. In this particular case, the facts adduced at trial show that the acquisition of Reserve without a capital credit would not have saved Reserve but turned the merged Reserve and Mid–Continent into one larger insolvent institution. The deal would not have been done by either defendant or plaintiff without the capital credit which was expected to produce profits. The expectation of these profits was relied upon by plaintiff and defendant alike to salvage Reserve and achieve the long-run health of the combined institution. This expectation was in fact the essential purpose of the Agreement. Although *Cal. Fed.* held otherwise, the court finds it foreseeable that a breach causing a diminution of capital is likely to also cause a reduction in profits.

### C. *Mitigation*

■ Defendant has argued that plaintiff "made no effort to mitigate the purported harm and is, therefore, not entitled to lost profits." [47] The general rule of a non-breaching party's responsibility for mitigation is that "damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation." [48] Further, "[a]s a general rule, a party cannot recover damages for loss that he could have avoided by reasonable efforts." [49]

■ Defendant argued that since plaintiff might have converted to a stock chartered institution prior to 1994 but did not, it failed to make a reasonable effort to replace the capital deprived by FIRREA. Dr. Bajaj cited examples during trial of many thrifts that in fact converted from mutual associations to stock charters prior to 1994. [50] In other words, because it may have been possible for plaintiff to convert its institution, it was thereby obliged to do so. Defendant buttresses this reasoning by showing that at least one factor in plaintiff's decision not to convert was management's fear that a con-

version would cause the management team to lose control of the bank to public investors. [51]

In fact, the shrink strategy employed by plaintiff was a form of mitigation. Management chose to shrink the institution in order to safeguard the thrift against new risks of failure created by the FIRREA-induced loss of capital. Had management ignored the effects of FIRREA, it is possible the thrift would have failed completely causing far greater harm to plaintiff's investors. It is not the task of the court to second guess the judgement of a skilled team of managers with a history of successful institutional management. Plaintiff was not required to change the entire financial structure of its institution, taking on what it deemed to be new risks of financial loss in order to mitigate the potential losses caused by FIRREA. The fact that a loss of control by then-current management was one factor in that decision is natural: that management team had led the bank to successively greater profits during the past decade and it is only prudent to fear the unknown losses that might occasion an unexpected change in management once the company converted to stock ownership. The demand that plaintiff convert from a mutual to stock association, in essence change the entire structure of its business in order to avoid an unknown amount of loss flowing from FIRREA, falls within the category of "undue risk or burden." Despite defendant's allegation that plaintiff failed to make reasonable efforts to avoid losses, the court finds that the shrink strategy was such an effort.

### D. *Tax Gross–Up*

■ Plaintiff has requested a tax-gross up of its award. "Where plaintiffs would not have paid taxes on the amount recovered, absent defendant's breach, that is, where the recovery is taxable but those monies to which plaintiffs were entitled would not have been further taxable, gross-up is appropriate."

---

**47.** Def.'s Br. at 19.

**48.** Restatement (Second) of Contracts § 350(1) (1979).

**49.** *Id.* at cmt. b.

**50.** Tr. at 2861.

**51.** Tr. at 812.

*Home Sav.,* 57 Fed.Cl. at 730 (citing *Oddi v. Ayco Corp.,* 947 F.2d 257, 267 (7th Cir.1991)).

Plaintiff has the burden of proving the taxable status of a damages award. See *Centex v. United States,* 55 Fed.Cl. 381 (2003). Plaintiff's damages are based on a lost profits theory, however, and it follows that its award replaces profits that would have been earned in the but-for world. Had those profits been earned, they would have been claimed as income and taxes would have been paid on that amount. Setting aside any differences in the rate at which income was taxed during the period of the breach and now, which neither party argued, there is no basis to increase that award by any amount of income taxes plaintiff might pay.

### E. *Replacement Income Claim*

■ During the only period in which plaintiff is entitled to damages, it claims $217,000 in "liability replacement income." According to Dr. Kaplan, this claim is justified because plaintiff's alleged lost profits would have eliminated the need to maintain certain high-cost liabilities, which would in turn lead to even greater profits. Although styled as "profit," this is essentially a claim for compound earnings on its lost profits award. If plaintiff had its lost profits, and if it had invested them in itself by paying off high-cost liabilities, it would have thereby increased that profit. Apart from the fact that this source of profit may be unforeseeable, defendant has argued persuasively that this amount represents prejudgment interest put forward under a different name.[52] If instead of using its lost profits to pay down high cost liabilities it had borrowed money from a third party, plaintiff would not be entitled to the interest paid to that third party because interest on borrowed money is not recoverable in suits against the government unless it is called for in the contract itself or in the government statute. *Marshall v. United States,* 143 Ct.Cl. 51, 54, 164 F.Supp. 221 (1958). Although plaintiff suggested at oral argument on motions in limine

that such an award was authorized by the contract, no such evidence materialized at trial. The general rule is that absent a specific provision made for interest in the contract, or as part of a constitutional claim, prejudgment interest is barred as a matter of law. *Library of Congress v. Shaw,* 478 U.S. 310, 319, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). Plaintiff is not entitled to any damages on the basis of its replacement income claim.

### II. Hypothetical Replacement Cost of Capital

■ At trial Dr. Kaplan presented two variations of a financial model alleged to provide a reasonable approximation of the value of plaintiff's supervisory goodwill. Although the model is given the name the "*LaSalle* Method" in one variant and the "*Glass* Method" in another, according to Dr. Kaplan they are basically "the same," [53] and they both arrive at the identical purported damages total.

The premise underlying both variants is that, although plaintiff did not actually replace its supervisory goodwill after FIRREA with tangible capital to make up for the shortfall, a hypothetical transaction can approximate with reasonable certainty what it would cost to replace the supervisory goodwill with an equally valuable asset at the time of the breach. The costs of this hypothetical transaction, therefore, may provide one measure of value of the promised accounting forbearance and supervisory goodwill. As the court understands Dr. Kaplan's model and its purpose, it does not, nor does it purport to show the actual cost of replacing the supervisory goodwill, which as a legal matter could not have been replaced. Likewise, the model does not purport to be the "cost of cover." Plaintiff did not engage in any transaction that might be described as "cover" nor did it attempt to replace the supervisory goodwill with tangible capital. Since it would be legally and financially im-

---

**52.** See Defendant's Motion In Limine To Exclude Any Evidence Related To Dr. Donald Kaplan's "Replacement Cost" Damages Model That Improperly Seeks Pre–Judgment Interest (Fed.Cl. February 28, 2003) (No. 95–472).

**53.** Tr. at 1194.

possible to "raise" supervisory goodwill or replace it with new supervisory goodwill, the model is offered to value an asset that would serve as a proxy for supervisory goodwill. By outlining a hypothetical transaction to raise capital of equal value to the supervisory goodwill at the time of the breach, Dr. Kaplan's model is offered to provide a reasonably certain measure of the benefit bargained for in the Agreement.

Under his so-called "*LaSalle* Method," Dr. Kaplan begins with the hypothesis that plaintiff could replace all of the roughly $7,800,000 in goodwill affected by the breaching provisions of FIRREA by issuing preferred stock. Although preferred stock could not be raised by a mutual association such as plaintiff at the time of the breach, preferred stock has all the attributes necessary to have an effect on plaintiff's balance sheet most similar to supervisory goodwill, in ways that neither debt nor common equity do. Dr. Kaplan contended that, therefore, it serves as the best proxy asset to measure the value of supervisory goodwill.

Once the preferred stock is issued, Dr. Kaplan showed by using certain assumptions that during the course of the remaining supervisory goodwill amortization period provided for by the Agreement, approximately $3,600,000 in net costs would be incurred for the payment of dividends to investors who provided the preferred stock capital. To arrive at this figure Dr. Kaplan posited, on the basis of public financial records and his own expertise, that investors at the time of the breach would have required a 20 percent return on their preferred stock investment in Commercial. It was further assumed that using the capital raised from the preferred stock, plaintiff would have purchased Treasury Bonds, which are a risk-free asset guaranteed to have the stability of supervisory goodwill over time, at a 7.9 percent yield. Each year, some of the Treasury Bonds would be sold and the proceeds used to repurchase the preferred stock from the investors, so that the balance of preferred stock capital declines over 22 years, mirroring the supervisory goodwill amortization schedule provided by the Agreement. Although the

structure of the transaction is different, Dr. Kaplan's "*Glass* Method" also seeks to determine the hypothetical preferred stock replacement cost for what was actually taken, supervisory goodwill, and arrives at a net cost of approximately $3,600,000.

Defendant describes the hypothetical cost of replacement model as "the same tired model that the Court has rejected time and time again." [54] On this count defendant appears to be on solid ground. In *Anchor Sav. Bank, FSB v. United States*, 59 Fed.Cl. 126, 2003 WL 22415878 (Sept. 29, 2003), for instance, the court "align[ed] itself with the myriad other cases rejecting models similar to the one plaintiff puts forward." *Id.* at 159, 2003 WL 22415878 at *38. That case followed *Citizens Fin. Serv., FSB v. United States*, 57 Fed.Cl. 64 (2003), *Fifth Third Bank of West. Ohio v. United States*, 55 Fed.Cl. 223 (2003), *Franklin Fed. Sav. Bank v. United States*, 55 Fed.Cl. 108 (2003) and *Columbia First Bank v. United States*, 54 Fed.Cl. 693 (2002), by rejecting hypothetical cost of replacement capital models on summary judgment. Elsewhere similar models have been described as leading to a result that is "absurd on its face," *Bank United of Tex. v. United States*, 50 Fed.Cl. 645, 656 (2001), and in another case, "inherently odd." *Glendale Fed. Bank v. United States*, 43 Fed.Cl. 390, 401 (1999).

Despite this long line of rejections, damages were awarded on the basis of a hypothetical cost of replacement capital theory in *Glass et al. v. United States*, 47 Fed.Cl. 316 (2000), *rev'd on other grounds*, 258 F.3d 1349 (Fed.Cir.2001). In that case the court recognized that the "transaction costs are hypothetical as is the entire model," but that "[t]he model represents damages, a value calculation for the usefulness of something that was contracted for, not an actual transaction." *Id.* at 328–29.

Apart from the extensive expert testimony of Dr. Bajaj, which challenged many of the financial assumptions of Dr. Kaplan's model, defendant's main legal objection to the theory is that it is hypothetical: that is, it does not measure any actual transactions plaintiff

**54.** Def.'s Br. at 25.

undertook to replace capital it lost due to the breaching provisions of FIRREA and plaintiff suffered no actual expenses associated with capital replacement.[55] Defendant asserts, therefore, that the model is barred as a matter of law.

Plaintiff repeatedly averred, however, that its model did not purport to measure an actual transaction, which it acknowledges never took place. Rather, it argued that there is nothing hypothetical about the loss of its $7,800,000 in supervisory goodwill. Plaintiff asserts that all its model purports to do is offer a means of valuing that loss for the purposes of expectancy damages. This is similar to the approach taken in *Glass*.

"The orders and opinions of a judge of coordinate jurisdiction constitute persuasive but not binding authority." *RSH Constructors, Inc. v. United States*, 20 Cl.Ct. 1, 6 n. 10 (1990) (quoting *Greenberg v. United States*, 1 Cl.Ct. 406, 407 (1983)). Despite its rejection in other cases before the Court of Federal Claims, the court does not believe that the use of a hypothetical cost of replacement model is barred, as a matter of law, by any Federal Circuit precedent. The ordinary principle of contract law is to put the plaintiff in as good a position as he would have been in had the contract been performed. Supervisory goodwill is a notoriously difficult asset to value. One way to show the value of something lost is by reference to similar, more easily valued substitutes. In an appropriate case, the court may find that damages flowing from an actual breach, which caused an actual loss of supervisory goodwill, may most reliably be estimated by a model showing the hypothetical cost of replacing the goodwill with a similar asset. If a reasonably certain value of the supervisory goodwill can be ascertained, such value must be offset according to the principle that "the non-breaching party is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred." *LaSalle*, 317 3d. at 1371 (citations omitted). "[I]n determining damages the benefits of that capital must be credited, as mitigation

due to the replacement of goodwill with cash." *Id.* at 1375.

Defendant's expert provided a range of factors that the court would need to consider in reducing plaintiff's hypothetical cost of capital damages claim. Nevertheless, such factors are not necessary to consider at this point. The court need not review the merits of this damages theory because it has settled on reliably certain damages based on plaintiff's lost profits model. Rather than replace its goodwill, plaintiff responded to the elimination of supervisory goodwill by shrinking, and "plaintiff's damages should be calculated on the basis of the actual means by which it filled its capital deficit." *LaSalle Talman v. United States*, 45 Fed.Cl. 64, 103 (1999), *rev'd on other grounds, LaSalle*, 317 F.3d at 1375 (rejecting a damages model calculation that does not reflect the "actual experience" of the institution).

Indeed, as the court recently stated in *Granite Mgmt. v. United States*, 58 Fed.Cl. 766, 777–78 (2003), "where the court is confronted with a choice between relying on a hypothetical cost of replacement model or the thrift[ ]'s actual experience ... the court should rely on the latter." The strategy that plaintiff employed in response to the breach was shrinkage, and the lost profits approach provides the soundest method of ascertaining the consequence of plaintiff's failure to deliver the benefit bargained for in the Agreement.

*Conclusion*

For the above-stated reasons, the Clerk of the Court is directed to enter judgment in favor of plaintiff in the amount of $5,602,000. Defendant's Motion In Limine To Exclude Opinions Of Dr. Donald Kaplan That Fail To Meet The Threshold For Admissibility Under Rule Of Evidence 702; Defendant's Motion In Limine To Exclude Opinions Of Dr. Donald Kaplan That Exceed The Scope Of His Expertise Or Constitute Legal Conclusions; Defendant's Motion In Limine To Exclude The Declaration Of Richard T. Pottorff Concerning The Admissibility Of 459 Exhibits; and all other currently outstanding, un-

---

**55.** Tr. at 3041.

resolved motions are hereby MOOT. Each side to pay its own costs, fees, and expenses.

IT IS SO ORDERED.