**BLUEBONNET SAVINGS BANK FSB, Stone Capital, Inc. and James M. Fail, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 95–532C.**

United States Court of Federal Claims.

Aug. 16, 2005.

I. Thomas Bieging, Washington, D.C., attorney of record for plaintiffs Bluebonnet Savings Bank, F.S.B. and Stone Capital, Inc.

Mitchell Rand Berger, Washington, D.C., attorney of record for plaintiff James M. Fail. Michael J. Schaengold and Ugo Colella, of counsel.

Elizabeth Marie Hosford, Department of Justice, Washington, D.C., with whom was Deputy Assistant Attorney General Stuart E. Schiffer, for defendant. David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director. Kenneth Michael Dintzer, Richard B. Evans, David C. Hoffman, F. Jefferson Hughes, of counsel.

## *OPINION*

FUTEY, Judge.

This *Winstar*-related case comes before the court after a trial devoted toward ascertaining the quantum of damages. Neither the parties nor the court were starting from scratch as six previous opinions and an extensive initial damages trial had already been etched onto the tablet. The issue examined at trial, therefore, did not concern entitlement as the United States Court of Appeals for the Federal Circuit (Federal Circuit) had on two separate occasions rejected defendant's argument that plaintiffs should receive no damages. *Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341, 1346 (Fed.Cir. 2003) (*Bluebonnet V*); *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1358 (Fed.Cir.2001) (*Bluebonnet III*). Rather, in light of the Federal Circuit's most recent mandate, it was established that the court properly began its analysis "by treating the entire $132,398,200 in surrendered equity as a cost resulting from the breach ...." *Bluebonnet V*, 339 F.3d at 1346. The difficult question posed to the court involves

determining whether, if at all, that amount should be reduced to reflect the true extent of the harm.

As has been the case throughout most of this litigation, the parties' arguments, although nominally removed from their firm "all or nothing" stances, gravitate toward the outer extremes of their respective positions. Several diametrically opposed themes permeate their arguments. Mr. James M. Fail, Consolidated Federal Savings and Loan Association (CFSB) Corporation (renamed Stone Capital, Inc.), and Bluebonnet Savings Bank, collectively referred to as plaintiffs, maintain that defendant bears the burden of proving any offset to the amount of damages, a burden which defendant allegedly has not met. Plaintiffs contend that the Federal Circuit mandated an examination of the "but-for" world from a 1992 perspective and concluded that no equity would have been relinquished in the absence of the breach. Plaintiffs do, however, concede a nominal amount of "but-for" costs and assert they are entitled to $129,827,388 in damages. On the other hand, defendant maintains that because plaintiffs are seeking expectancy damages, they bear the burden of propounding a realistic "but-for" world. Defendant also contends that the Federal Circuit's opinion did not limit the court's analysis to any particular time-frame. Further, defendant avers that the Federal Circuit's opinion did not preclude the possibility of plaintiffs surrendering equity in the "but-for" world. Defendant concludes that, depending on the "but-for" world start date, plaintiffs should receive either $545,219 or $20,692,620 in damages. Lastly, both parties proffer estimated damages and a sensitivity analysis in the event the court relies on the jury verdict method to calculate damages.

## Factual Background

As this case is a *Winstar*-related case, it is unnecessary to revisit the history of the savings and loan crisis. This has been done extensively in prior opinions of the United States Supreme Court, the Federal Circuit, and this court. See, e.g., *United States v. Winstar Corp.*, 518 U.S. 839, 843–56, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *Bluebonnet Sav. Bank, FSB v. United States*, 47 Fed.Cl. 156, 158 (2000) (*Bluebonnet II*), rev'd in part, 266 F.3d 1348, 1354–55 (Fed.Cir. 2001).[1]

In November 1988, Mr. Fail expressed an interest in acquiring a Southwest thrift package, the Pard/Rose package, which was comprised of fifteen insolvent thrifts. Following extensive negotiations and Mr. Fail's submission of two bids, the Federal Home Loan Bank Board (FHLBB) approved Mr. Fail's second bid. As part of the Assistance Agreement entered into between Bluebonnet, CFSB, and the Federal Savings and Loan Insurance Corporation (FSLIC), Mr. Fail and CFSB were required to infuse $120 million into Bluebonnet over a two-year period. An initial infusion of $70 million was due on December 22, 1988,[2] the date the Assistance Agreement was entered into, and an additional $25 million was required on the first and second anniversary dates. In exchange for acquiring the thrifts and for making the capital infusions, the FSLIC agreed to provide a specified amount of assistance. Specifically, FSLIC committed to providing approximately $3 billion in cash assistance and to granting Bluebonnet certain regulatory forbearances: "(1) to operate with reduced capital level requirements, (2) to pay dividends as along as Bluebonnet maintained

---

1. The facts of this case were discussed in great detail in several opinions of this court as well as the Federal Circuit. *Bluebonnet V*, 339 F.3d at 1343–44; *Bluebonnet III*, 266 F.3d at 1350–54; *Bluebonnet Sav. Bank, FSB v. United States*, 47 Fed.Cl. 156, 158–67 (2000) (*Bluebonnet II*); *Bluebonnet Sav. Bank, FSB v. United States*, 43 Fed.Cl. 69, 71–73 (1999) (*Bluebonnet I*). The court, therefore, finds it unnecessary to describe the entire factual background here and will only discuss the factual information most pertinent to this stage of the litigation. Further, given the complexity of the issue before the court, the

factual background is not intended to be all-encompassing. Additional findings will be made in the discussion section that follows.

2. With respect to the initial $70 million, CFSB agreed to infuse $35 million into Bluebonnet through the purchase of Bluebonnet common stock. The remaining $35 million would be infused in the form of subordinated debt issued by Bluebonnet to be purchased by Lifeshares Group, Inc., an insurance company owned by Mr. Fail, or one of its affiliates.

those capital level requirements, and (3) to treat subordinated debt as regulatory capital." *Bluebonnet V,* 339 F.3d at 1343.

On August 9, 1989, the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Pub.L. No. 101–73, 103 Stat. 183, was enacted. FIRREA impacted plaintiffs by requiring them to maintain, at a minimum, core capital ratio equal to 3% of assets. FIRREA also eliminated the treatment of subordinated debt as regulatory capital, which caused Bluebonnet to temporarily fall out of capital compliance. In addition, FIRREA "limited Bluebonnet's ability to pay dividends ...." *Bluebonnet V,* 339 F.3d at 1343. On August 8, 1995, plaintiffs filed suit in this court alleging a breach of contract and asserting "that as a result of the breach they experienced increased costs in financing their required cash infusions into Bluebonnet." *Id.*

After entertaining the parties' cross-motions for summary judgment, then-Chief Judge Smith held, in pertinent part, that FIRREA and its implementing regulations breached the capital plan, subordinated debt, and dividend forbearances. *Bluebonnet Sav. Bank, FSB v. United States,* 43 Fed.Cl. 69, 80 (1999) (*Bluebonnet I*). Once the government's liability and plaintiffs' standing were determined, the case was transferred to the undersigned Judge for further proceedings. The court conducted approximately six weeks of trial on the issue of damages. The court held that "it was foreseeable under the circumstances that [plaintiffs] would incur the increased financing costs they now claim without dividends to assist in obtaining additional loans and repaying existing debt." *Bluebonnet II,* 47 Fed.Cl. at 172. The court also held that "it was objectively foreseeable at the time the parties entered the contract that a breach of the capital plan and subordinated debt forbearances would cause plaintiffs to incur increased financing costs." *Id.* at 173.

Turning to the causation prong of an expectancy damages analysis, the court resolved that factor in plaintiffs' favor as well. The court concluded that: (1) the breach increased CFSB's and Mr. Fail's credit risk, (2) the breach foreclosed any financing options apart from Mr. Robert T. Shaw, (3) the dividend irrelevance proposition did not apply, and (4) factors unrelated to the breach did not cause plaintiffs' damages. *Id.* at 175–80. In other words, the court held that the "breaches were a substantial factor in causing plaintiffs' alleged damages." *Id.* at 180; see also *id.* at 178–79 (explaining with respect to the 1989, 1990 and 1992 loans, "[t]he evidence demonstrates that the breaches, and particularly the breach of the dividend forbearance, were a substantial factor in causing Mr. Fail and CFSB to incur increased financing costs").

Although the court determined that plaintiffs had demonstrated foreseeability and causation, it nevertheless concluded that plaintiffs' claim ultimately failed because they did not prove their damages with reasonable certainty. The court rejected plaintiffs' expert's model of "but-for" costs on two grounds. First, Professor Roman Weil, plaintiffs' expert, had incorporated a 13.5% interest rate into his damages model. The problem with that figure was that at trial "[n]o fact witnesses testified they would have loaned CFSB approximately $43 million at 13.5% to fund the[ ] infusions." *Id.* at 182. Second, Mr. James G. Valeo, plaintiffs' expert, "conceded that he would have wanted the $35 million loan to be made long-term before his investors would invest the $50 million." *Id.* Because there was no evidence presented that the $35 million loan would have been made long-term, the court found the "evidence [to be] insufficient to establish that plaintiffs would have obtained the capital financing assumed in their model absent the breach." *Id.*

In addition to the above shortcomings, the court discerned additional infirmities in plaintiffs' model. Notably, the court rejected plaintiffs' non-Economic Benefit Agreement (EBA) related damages because Professor Weil improperly included prejudgment interest in his model and improperly assumed that CFSB would have paid down its debt as quickly as possible. *Id.* at 183–85. As to plaintiffs' EBA damages, the court was unable to accept the costs contained within the Memo Account because no witness, or documentary evidence, could establish their ori-

gin. *Id.* at 185. Therefore, in sum, the court held that although plaintiffs established foreseeability and causation, they were not entitled to recover because they failed to prove their damages with reasonable certainty. *Id.*

Plaintiffs appealed this court's decision to the Federal Circuit, and defendant raised an issue with respect to liability. The Federal Circuit, in one paragraph, rejected defendant's argument that the parties' settlement agreement barred plaintiffs' subordinated debt claim.[3] *Bluebonnet III,* 266 F.3d at 1355. After dispensing with defendant's liability argument, the Federal Circuit turned to the issue of damages. The Federal Circuit upheld this court's findings regarding foreseeability and causation, *id.* at 1355–56, and also upheld this court's rejection of plaintiffs' non-EBA related damages. *Id.* at 1358. The Federal Circuit, however, disagreed with this court's conclusion that the Memo Account did not measure damages with reasonable certainty. *Id.* at 1356–58. Not only did the Federal Circuit hold that the Memo Account met the reasonable certainty test, it also stated that this court could have approximated EBA damages through a jury verdict analysis. *Id.* at 1357–58. Specifically, the Federal Circuit reasoned that this court should not have "second-guess[ed] the terms" of the Memo Account because it was a "document regularly prepared in the normal course of business and . . . the amounts owed were agreed to by representatives of [Mr.] Shaw and [Mr.] Fail, whose interests were adverse to each other." *Id.* at 1357. The Federal Circuit then indicated that plaintiffs "persuasively argue[d] . . . [they] should be entitled to the *entire cost of the EBA,*" *id.* at 1356 (emphasis added), and "remanded [the case] with instructions to formulate an appropriate award of EBA-related damages as determined by the payments already made by [Mr.] Fail to [Mr.] Shaw under the EBA, and the value of the EBA debt as calculated in the Memo Agreement." *Id.* at 1358.

This court, in accordance with its interpretation of the Federal Circuit's express language, added $5,400,392, Mr. Fail's payments to Mr. Shaw, to $126,997,808, the value of the EBA debt, and entered judgment for Mr. Fail in the amount of $132,398,200. *Bluebonnet Sav. Bank, FSB v. United States,* 52 Fed.Cl. 75, 77 (2002) (unpublished) (*Bluebonnet IV*) ("The court is constrained by the mandate of the Federal Circuit."), *vacated and remanded,* 339 F.3d 1341 (2003). Defendant this time appealed to the Federal Circuit, which "clarif[ied] that [its] prior opinion was not meant to foreclose any further inquiry by [this court] into the issue of damages." *Bluebonnet V,* 339 F.3d at 1342. The essence of the Federal Circuit's opinion was as follows:

> [W]hile it was proper for the trial court to begin its damages analysis on remand by treating the entire $132,398,200 in surrendered equity as a cost resulting from the breach, that does not end the matter. It is necessary for the court to make a further determination as to what costs, if any, the plaintiffs would have incurred in the absence of the breach and thus to ascertain the net financial effect of the breach on the plaintiffs.

*Id.* at 1346. Further, in a section of the opinion which has been at the center of the dispute between the parties, the Federal Circuit stated: "It has been determined that the plaintiffs would not have entered into the EBA but for the breach, that 'dividend financing would have been available,' and that 'it would have been unnecessary [for the plaintiffs] to give up a significant equity stake in CFSB to obtain financing.'" *Id.* at 1345 (quoting *Bluebonnet III,* 266 F.3d at 1356). Subsequently, plaintiffs filed a petition for rehearing, which the government opposed.[4] The Federal Circuit denied the request, and the case was remanded to this court.

---

3. The settlement agreement was entered into at the conclusion of the district court litigation and capped the damage recovery in this case to $136,075,000. *Bluebonnet Sav. Bank, FSB v. United States,* 52 Fed.Cl. 75, 77 n. 4 (2002) (unpublished) (*Bluebonnet IV*), *vacated and remanded,* 339 F.3d 1341 (2003).

4. *Bluebonnet Sav. Bank, FSB v. United States,* 2003 U.S.App. LEXIS 23150 (Fed.Cir. Nov. 12, 2003) (opinion on petition for rehearing) (unpublished).

The parties submitted their Memoranda of Contentions of Law and Fact pursuant to Appendix A of the Rules of the United States Court of Federal Claims and exchanged expert reports. The court held a six-day hearing with expert testimony on damages from February 22,2005, until March 1, 2005. Post-trial briefs were submitted in lieu of closing arguments. The parties simultaneously filed their opening post-trial briefs on May 2, 2005. Plaintiffs' reply post-trial brief was filed by leave of the judge on May 31, 2005, whereas defendant's reply post-trial brief was filed by leave of the judge on June 1, 2005.

## Discussion

■■■ A party's "expectation interest" is the "interest in having the benefit of [its] bargain by being put in as good a position as [it] would have been in had the contract been performed." Restatement (Second) of Contracts § 344(a) (1981). In other words, the law protects the non-breaching party's expectation interest by "attempting to put the [non-breaching party] in as good a position as [it] would have been in had the contract been performed, that is, had there been no breach." *Id.* cmt. a. "Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." *Bluebonnet III*, 266 F.3d at 1355 (citing Restatement (Second) of Contracts §§ 347, 351, 352). A plaintiff has the burden to prove expectancy damages with reasonable certainty. *Commercial Fed. Bank, FSB v. United States*, 59 Fed.Cl. 338, 350 (2004) (citing *Bluebonnet III*, 266 F.3d at 1355), aff'd, 125 Fed.Appx. 1013 (2005). These factors, when applied in concert, ensure that a damages award may not be based on mere speculation. See *id.*

This court is also guided by the Federal Circuit's statement that "[t]he ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable ap-

proximation.'" *Bluebonnet III*, 266 F.3d at 1355 (quoting *Elec. & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 257, 416 F.2d 1345 (1969)). "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Locke v. United States*, 151 Ct. Cl. 262, 267, 283 F.2d 521 (1960) (citation omitted). The court, therefore, embraces the principle that "when damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363, 1374 (Fed.Cir.2003). The court is aware, however, that "the non-breaching party is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred." *Id.* at 1371 (citations omitted).

### I. *Burden of Proof*

Plaintiffs maintain that to the extent any amount should be deducted from the cost of the equity surrender, defendant bears the burden of proving the offset. To support its position, plaintiffs rely on *Westfed Holdings, Inc. v. United States*, 52 Fed.Cl. 135, 155 (2002), and *Southern Cal. Fed. Sav. & Loan Ass'n v. United States*, 57 Fed.Cl. 598, 639 (2003). Conversely, defendant asserts that when expectancy damages are at issue, the party seeking said damages is responsible for establishing the "but-for" world. Defendant maintains that the cases plaintiffs rely upon are inapposite. Defendant avers that *Westfed Holdings* is distinguishable because it involved reliance damages and that *Southern Cal.* is inapplicable because it dealt with a restitution claim.

■■■ As a general matter, a plaintiff bears the burden of proving the required elements of its damages claim. See *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed.Cir.1987). After the plaintiff has satisfied its burden, the law in specific instances shifts the burden from the non-breaching party, the plaintiff, to the breaching party, the defendant, to demonstrate that offsets to the plaintiff's recovery are warranted. These offsets typically included losses that the plaintiff would have incurred had the

contract been performed, or benefits the plaintiff received from the portion of the contract that was completed. The "net loss" approach is consistent with, and presumably derives from, a combination of several basic tenets of contract law: (1) an award of damages should not place the non-breaching party in a better position than if the breaching party had fulfilled its promise and performed the contract in its entirety, and (2) that the risk of uncertainty rests with the breaching party. *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1327 (Fed.Cir.2002) ("[T]he risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages.") (quoting *Mid–America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1366 (7th Cir.1996)). This burden-shifting construct certainly applies in either a cause of action for reliance damages or a restitution claim.

For instance, in *Westfed Holdings,* this court analyzed the parties' burdens in the context of reliance damages. The law protects a party's "reliance interest" by ensuring that the party is "reimbursed for loss caused by reliance on the contract by being put in as good a position as [it] would have been in had the contract not been made." Restatement (Second) of Contracts § 344(b). While this court noted that reliance damages "incorporate[ ] both reliance and expectation elements," it concluded that the plaintiff was first required to show that the losses or expenses were incurred in reliance on the contract prior to the burden shifting to the defendant to demonstrate losses that would have been incurred had the contract been fully performed. *Westfed Holdings,* 52 Fed. Cl. at 155. This court's conclusion in *Westfed Holdings* unremarkably expanded upon the proposition set forth in the Second Restatement of Contracts that "the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." Restatement (Second) of Contracts § 349. The same holds true for the Federal Circuit's opinion in *Westfed Holdings,* which merely confirmed this court's interpretation of the parties' respective burdens in the context of reliance damages. See *Westfed Holdings, Inc. v. United States,* 407 F.3d 1352, 1369–71 (Fed. Cir.2005).

A party's "restitution interest," on the other hand, is its "interest in having restored to [it] any benefit that [it] has conferred on the other party." Restatement (Second) of Contracts § 344(c); see also *Granite Mgmt. Corp. v. United States,* 416 F.3d 1373, 1379–80 (Fed.Cir.2005). "Because the purpose of restitution is to restore the plaintiff to its status quo ante, the award to the plaintiff must be reduced by the value of any benefits that it received from the defendant under the contract, so that only the actual, or net, loss is compensated." *Landmark Land Co., Inc. v. FDIC,* 256 F.3d 1365, 1373 (Fed.Cir. 2001) (citing Restatement (Second) of Contracts § 384 cmt. a); see also *Granite Mgmt. Corp. v. United States,* 58 Fed.Cl. 766, 771 (2003) (explaining that restitution must be offset by any benefit that the non-breaching party received).[5] The question as to whether the breaching party or the non-breaching party bears the burden concerning off-setting benefits was discussed in *Landmark.* The Federal Circuit expressly upheld this court's denial of the defendant's offset because defendant "did not establish that any benefits that plaintiff obtained in the form of dividends from Dixie Savings and Loan can be attributed to the government."[6] *Landmark,* 256 F.3d at 1373 (quoting *Landmark,* Order at 1 (April 5, 2000)). The significance of this statement lies in the fact that a deduction of an alleged benefit was prohibited because the defendant did not satisfy its burden of showing that an offset was appropriate.

---

5. See also Restatement (Second) of Contracts § 371 cmt. a ("To the extent that the benefit may reasonably be measured in different ways, the choice is within the discretion of the court.").

6. This court in *Landmark* also denied an offset on the basis that "[d]efendant did not present convincing evidence at trial that the ... deficit was a benefit to the plaintiff." *Landmark Land Co., Inc. v. U.S.,* 46 Fed.Cl. 261, 277–78 (2000).

While the court does not seek to place undue emphasis on a technical damages title, see *Caroline Hunt Trust Estate v. United States*, 65 Fed.Cl. 271, 299 (2005), it does conclude that the type of damages sought in this case varies the burden of proof. Plaintiffs are not advancing either a reliance or restitution claim; rather, plaintiffs are advancing an expectancy damages theory.[7] See *Bluebonnet III*, 266 F.3d at 1355 (explaining the rationale behind a party's expectation interest). The resolution of the issue in the context of the former does not necessarily resolve the issue in the context of the latter. This court has held that "[w]ith respect to explaining its expectancy damages ... plaintiff bears the burden of propounding a realistic but-for scenario ...." *Coast Fed. Bank, FSB v. United States*, 48 Fed.Cl. 402, 430 n. 25 (2000); see also *Southern Cal.*, 57 Fed.Cl. at 633 (explaining that "establish[ing] a 'but-for' world ... is ordinarily required to state a valid claim for expectancy damages"). In other words, plaintiffs bear the burden of demonstrating "what might have been ...." *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001). Accordingly, because plaintiffs in this case are seeking expectancy damages, it is incumbent upon them to establish a plausible "but-for" world.

Two additional considerations warrant the court's attention. First, the fact that *Coast* and *Glendale* addressed, in pertinent part, a lost profits theory of expectancy damages does not alter the court's conclusion. "The benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well." *Glendale*, 239 F.3d at 1380 (citing Restatement (Second) of Contracts § 347). Another such damages theory under expectancy damages, as referenced in *Glendale*, includes the cost of replacement capital. *LaSalle Talman*, 317 F.3d at 1374 (explaining that "the cost of capital replacement can serve as a valid theory for measuring expectancy damages ..."). In proffering a model for the net cost of replacing supervisory goodwill, a plaintiff is required to account for "the bene-

fits tangible capital enjoyed over the goodwill it replaced." *Bank of Am., FSB v. United States*, 67 Fed.Cl. 577, 581, 2005 WL 1792182, at *3, 2005 U.S. Claims LEXIS 212, at *13 (Fed.Cl. July 21, 2005); accord *LaSalle Talman Bank, FSB v. United States*, 64 Fed.Cl. 90, 107 (2005); *Citizens Fed. Bank, FSB v. United States*, 59 Fed.Cl. 507, 526 (2004). Therefore, a "cost of replacement capital" claim, which is a form of expectancy damages apart from lost profits, places the burden on the plaintiff to demonstrate that the costs actually incurred in replacing supervisory goodwill were not subsumed by the benefits or earnings received from the substitution.

Second, and perhaps more significantly, in *Bluebonnet III*, the Federal Circuit affirmed this court's rejection, after trial, of plaintiffs' non-EBA related damages. *Bluebonnet III*, 266 F.3d at 1358. Upon examining plaintiffs' "but-for" costs, this court noted that "if plaintiffs cannot prove that they could have raised ... $78 million at 13.5%, their damage model would not work because their but-for world would not be achievable." *Bluebonnet II*, 47 Fed.Cl. at 182. The Federal Circuit likewise rejected this claim because "there was no evidence presented that anyone would have loaned CFSB the funds required for the capital infusions at 13.5%." *Bluebonnet III*, 266 F.3d at 1358. The importance of the Federal Circuit's holding is two-fold: (1) plaintiffs presented a model which purported to establish the costs in the absence of the breach, and (2) plaintiffs could not recover because they had failed to prove their "but-for" world. If plaintiffs did not have any burden with respect to establishing "but-for" costs, it would have been immaterial that plaintiffs did not establish that they could have obtained a loan at 13.5%. Thus, the Federal Circuit recognized that plaintiffs were responsible for establishing the "but-for" world.

Lastly, this court in *Southern Cal.* construed *Bluebonnet II* and *Bluebonnet III* as holding that a plaintiff, in certain circumstances, need not establish what would have occurred in the absence of the breach. *Southern Cal.*, 57 Fed.Cl. at 633–34. The court, however, does not subscribe to *South-*

---

7. Plaintiffs' Post–Hearing Opening Brief at 32 (noting that "expectation damages are at issue").

*ern Cal.'s* interpretation of those cases. First, *Southern Cal.* was decided prior to *Bluebonnet V,* which clarified the Federal Circuit's previous holding and made clear that the analysis did not entail simply adding "the payments already made by [Mr.] Fail to [Mr.] Shaw under the EBA, and the value of the EBA debt as calculated in the Memo Agreement." *Bluebonnet III,* 266 F.3d at 1358. Second, *Southern Cal.'s* interpretation of *Bluebonnet II* and *Bluebonnet III* runs contrary to, as was discussed above, *Bluebonnet III's* holding affirming the court's denial of plaintiffs' non-EBA related damages for failing to establish a realistic "but-for" scenario. Accordingly, to the extent there is tension between the court's conclusion and *Southern Cal.'s* interpretation, the court adopts the former.

## II. *Professor Calomiris' Damages Model*

■ Professor Charles Calomiris, plaintiffs' expert, determined that plaintiffs were entitled to damages in the amount of $129,827,388. Professor Calomiris is the Henry Kaufman Professor of Financial Institutions at the Columbia University Graduate School of Business and also sits as Chairman of the Board of Greater Atlantic Financial Corporation, which is a holding company for Greater Atlantic, a thrift. Throughout his career, Professor Calomiris has held, and continues to hold, several consulting as well as academic positions, and has published extensively in his field. The court admitted Professor Calomiris as an expert, without objection, "in the areas of economic and corporate finance as they apply to financial institutions, and in the area of cost of capital for financial institutions." [8]

Professor Calomiris proffered the following damages model in support of plaintiffs' claim, which centered around seven critical assumptions: (1) no equity surrender was necessary to obtain financing; (2) Mr. Shaw would not have been the only source of financing and other sources of financing would have been available; (3) dividends would have been paid to CFSB and would have been used to support financing; (4) the "but-for" and actual financial condition of a consolidated CFSB on September 30, 1992, are identical; (5) "[Mr.] Fail and CFSB create a holding company above CFSB called Stone Holdings to assume [Mr.] Fail's debt in return for ownership of [Mr.] Fail's CFSB stock, just as in the actual world;" [9] (6) subordinated debt is issued by Stone Holdings as of September 30, 1992; and (7) the "but-for" and actual worlds are identical with respect to loan amounts.

Building upon these assumptions or "circumstances," Professor Calomiris conducted four complementary analyses to ascertain the "but-for" financing costs. Professor Calomiris relied upon a: (1) comparables analysis, (2) regression analysis, (3) 1993 Smith Barney preferred stock opinion, and (4) 1992 yield on "B" rated debt. First, Professor Calomiris undertook the comparables analysis in which he examined 16 public debt issues during the 1992–1993 time-frame. Professor Calomiris concluded that the highest yield was 13%, which was issued by Coast Federal Bank. Professor Calomiris then compared the 16 financial institutions to Stone Holdings, with a particular emphasis on comparing Stone Holdings to Coast. Based on this analysis, Professor Calomiris determined that Stone Holdings was a "superior credit risk to Coast." [10] In other words, the 13% yield issued by Coast would be the "upper bound" [11] at which Stone Holdings could issue debt.

To pinpoint the exact interest rate at which Stone Holdings would issue debt, Professor Calomiris performed a regression analysis. Professor Calomiris examined 44 transactions, including the 16 transactions identified in the comparables analysis plus convertible debt and preferred stock issues. "The regression analysis conservatively estimated a 12.2% interest rate on [Stone] Holdings' sub-debt in the 1992 but-for world." [12]

8. Transcript of Hearing (Tr.) at 70.

9. Plaintiffs' Post–Hearing Opening Brief at 23.

10. Tr. at 235.

11. *Id.* at 212.

12. Plaintiffs' Post–Hearing Opening Brief at 28 (citing Tr. at 208–09, 235–36).

Next, Professor Calomiris sought to solidify his analysis by showing why he believed the 12.2% was a conservative estimate. First, Professor Calomiris referenced a 1993 Smith Barney preferred stock opinion which assigned Bluebonnet a credit rating of "BB" and estimated a 9% interest rate on the issuance of preferred stock.[13] Then, relying on the Smith Barney opinion that Bluebonnet would have been rated "BB," Professor Calomiris looked to the average yield rate in 1992 on "B" rated debt, which is an inferior credit rating to "BB." Professor Calomiris reasoned that since the average yield on "B" rated debt was 11.62%, his estimated 12.2% interest rate for a "BB" rated institution was conservative.

In addition to ascertaining the "but-for" interest payments, Professor Calomiris also estimated the "but-for" underwriting costs associated with Stone Holdings' debt issuance. Professor Calomiris concluded that the underwriting costs would amount to $4,407,843, which is the equivalent of 4.06% of the principal amount of the loan.

After discerning the above figures, percentages, and costs, Professor Calomiris plugged the results into his damages equation. Professor Calomiris began his calculation by treating the $132,398,200 as the "ceiling on damages."[14] Professor Calomiris then asked if any amount should be offset from the value of the surrendered equity. He answered this question in the affirmative and sought to reduce the amount of damages accordingly. Professor Calomiris calculated the amount of the "but-for" costs by adding the difference between the "but-for" interest costs and the actual interest costs ($1,126,272) to the difference between the "but-for" underwriting costs and the actual EBA related loan fees ($1,444,540). Professor Calomiris next subtracted the total, $2,570,812, from

the $132,398,200, to arrive at a damages figure, as mentioned above, of $129,827,388. Plaintiffs maintain that "[b]ecause [Professor Calomiris'] model used a 'conservative assumption' at 'every step' of his analysis ... 'it is possible to reasonably estimate damages greater than that number, but not less.'"[15]

Despite Professor Calomiris' extensive efforts to substantiate plaintiffs' damages, the court cannot conclude his model proves damages with reasonable certainty. See Bluebonnet III, 266 F.3d at 1355 (citing Restatement (Second) of Contracts §§ 347, 351, 352). Professor Calomiris, in a manner which has plagued the history of Winstar-related litigation, adopted an extreme stance which, not surprisingly, maximized damages. The Federal Circuit has cautioned that "[i]t would benefit the thrifts and the Government, since it is not in the interest of either to have endless litigation, for both to stop arguing extreme positions and promptly resolve these cases in a fair and even-handed manner." Glendale Fed. Bank, FSB v. United States, 378 F.3d 1308, 1313–14 (Fed.Cir.2004). Plaintiffs did not heed the Federal Circuit's advice and Professor Calomiris' model now lays peril to its ramifications. One result of both parties advancing models on opposite sides of the spectrum, apart from the outright rejection of both models,[16] is that the acceptance of one model almost inevitably leads to the collapse of the other. That is the case here, as the court's rejection of two critical assumptions in Professor Calomiris' model renders it speculative.

As will be discussed in greater detail below, the court first rejects Professor Calomiris' assumption that plaintiffs would not have surrendered equity.[17] Significantly, the court disagrees with Professor Calomiris' reading of the Federal Circuit's opinion. Professor Calomiris places particular empha-

13. Plaintiffs' Exhibit (PX) 3019.

14. Tr. at 297.

15. Plaintiffs' Post–Hearing Opening Brief at 32 (quoting Tr. at 297).

16. Bluebonnet V, 339 F.3d at 1345 ("Both sides ... continue to take an all-or-nothing approach on appeal.... We do not accept either of those extreme positions.").

17. The court in this section briefly discusses the legal flaws with Professor Calomiris' interpretation of the Federal Circuit's opinion and his model. The remainder of the analysis, which factually discredits Professor Calomiris' model, is set forth in the discussion of Professor Alan Shapiro's model.

sis on the Federal Circuit's statement that "it would have been unnecessary [for the plaintiffs] to give up a significant equity stake in CFSB to obtain financing," *Bluebonnet V,* 339 F.3d at 1345 (quoting *Bluebonnet III,* 266 F.3d at 1356), in concluding that the Federal Circuit required his damages model to include a "non equity surrender debt instrument." [18] The court, however, believes that this statement pertained to the conclusion that plaintiffs "would not have entered into the EBA but for the breach" and was not intended to be an overarching limitation on damages. See *id.* Further, the court notes that the term "equity" is qualified with the adjective "significant." Professor Calomiris would exclude from the definition of the terms "significant equity" only equity surrenders with "admitted values ... close to zero[,] but effectively zero ...." [19] Assuming *arguendo* that the court read the phrase to apply to damages in general, the court nevertheless would not ascribe Professor Calomiris' meaning to the terms "significant equity." While values "close to zero" or "effectively zero" would certainly not fall within the category of "significant equity," there is an entire range of percentages which, although not acknowledged within Professor Calomiris' model, would likewise, in the court's opinion, not constitute a "significant equity" surrender. Accordingly, Professor Calomiris' inaccurate assumption regarding the surrender of equity is fatal to his model's reliability.

Second, Professor Calomiris' model also fails the reasonable certainty test because he incorrectly assumes that the damages analysis was to focus on the 1992 time-frame. Specifically, Professor Calomiris stated that "the [Federal Circuit] ... told [him] that [he] need[ed] to focus on 1992 ...." [20] This argument derives from the Federal Circuit's following statement:

Because the surrender of equity as part of the EBA constituted a substantial conveyance of value to Mr. Shaw, it may be that the other terms of the EBA through which plaintiffs obtained long-term loans from Mr. Shaw were more favorable than the

financing arrangement they would have been able to achieve absent a breach.

*Bluebonnet V,* 339 F.3d at 1345. The Federal Circuit's statement, in isolation, could plausibly be interpreted as implying a 1992 time-frame, given that the language suggests an analysis related to the "other terms of the EBA." *Id.* Another portion of the opinion, however, makes clear that Professor Calomiris' interpretation assumes too much. The Federal Circuit expressly "ask[ed] the trial court to consider the alternatives to the equity arrangement in the EBA that the plaintiffs would have faced if there had been no breach." *Id.* at 1346. It is entirely conceivable that the alternatives faced by plaintiffs could have come to fruition prior to 1992. Therefore, because Professor Calomiris' model began in the 1992 time-frame, the court cannot characterize it as reasonably certain.

Two propositions of vital importance to the court's analysis have been established at this point: (1) plaintiffs bear the burden of proof with respect to establishing the "but-for" world, and (2) Professor Calomiris' model does not meet the reasonable certainty test. At an initial glance, it would appear that plaintiffs have not met their burden and, therefore, are not entitled to recover any damages. As defendant has likely anticipated, however, that outcome is not forthcoming in this case. Building on its decision in *Bluebonnet III,* which overturned this court's award of zero damages to plaintiffs because they had not established the equity surrender portion of the EBA with reasonable certainty, the Federal Circuit in *Bluebonnet V* "again reject[ed] the government's argument that it should pay no damages at all." *Bluebonnet V,* 339 F.3d at 1346. The Federal Circuit then provided guidance with respect to the legal theory which this court should apply to fulfill the "no damages" requirement of the mandate: jury verdict damages. *Id.;* see also *Bluebonnet III,* 266 F.3d at 1358 ("Even if Bluebonnet had been justifiably unable to substantiate the amount of EBA damages, it would have been appropriate for the court to award jury verdict damages as a

18. Tr. at 392.

19. *Id.* at 388.

20. *Id.* at 385.

fair and reasonable approximation of EBA damages."). The Federal Circuit's admonition could not have been more clear: "We reiterate the point made in our prior opinion that, at a minimum, jury verdict damages would be appropriate in this case." *Bluebonnet V,* 339 F.3d at 1346.

### III.  *Jury Verdict Damages*

The Federal Circuit explained the concept of jury verdict damages in *Bluebonnet III* as follows:

"We have also allowed so-called 'jury verdicts,' if there was clear proof of injury and there was no more reliable method for computing damages—but only where the evidence adduced was sufficient to enable a court or jury to make a fair and reasonable approximation." *Elec. and Missile Facilities,* 416 F.2d at 1358 n. 46 (citing *Bell v. United States,* 186 Ct.Cl. 189[, 404 F.2d 975] (1968)). "In estimating damages, the Court of Claims occupies the position of a jury under like circumstances; and all that the litigants have any right to expect is the exercise of the court's best judgment upon the basis of the evidence provided by the parties." *Specialty Assembling[ & Packing Co. v. U.S.,* 174 Ct.Cl. 153], 355 F.2d [554] at 572 [(1966)] (citing *United States v. Smith,* 94 U.S. 214, 219[, 12 Ct.Cl. 119, 24 L.Ed. 115] (1876)).... "The amount of the recovery can only be approximated in the format of a 'jury verdict' where the claimant can demonstrate a justifiable inability to substantiate the amount of his resultant injury by direct and specific proof." *Joseph Pickard's Sons Co. v. United States,* [209 Ct.Cl. 643], 532 F.2d 739, 742 (Ct.Cl.1976).

*Bluebonnet III,* 266 F.3d at 1357–58; accord *Dawco Constr., Inc. v. United States,* 930 F.2d 872, 880 (Fed.Cir.1991). This court has applied jury verdict damages in the *Winstar* context. *Caroline Hunt,* 65 Fed.Cl. at 330 (explaining that "there is sufficient evidence to make a fair and reasonable approximation

of damages and offsetting benefit. Accordingly, as an alternative to the foregoing, the court applies the so-called 'jury-verdict' approach to damages [to award net damages of $14,847,100]"); *Commercial Fed.,* 59 Fed.Cl. at 351 ("The court also believes ... that under the jury verdict method, this amount would be a fair and reasonable approximation of the damages caused [by] FIRREA."); *White Buffalo Constr., Inc. v. United States,* 52 Fed.Cl. 1, 11 (2002) (applying a jury verdict damages analysis in a government contracts dispute). As mentioned above, given the Federal Circuit's rejection of defendant's zero damages argument and its instruction that "at a minimum ... jury verdict damages would be appropriate in this case" the court proceeds to a jury verdict analysis. *Bluebonnet V,* 339 F.3d at 1346. To facilitate the analysis, the court adopts, with one adjustment, Professor Alan Shapiro's, defendant's expert, damages model.[21]

### A.  *Professor Shapiro's Damages Model*

Professor Shapiro is the Ivadelle and Theodore Professor of Banking and Finance at the University of Southern California and has held this chair for approximately 15 years. He has taught for 37 years and holds a Ph.D. from Carnegie–Mellon University. Among other areas of study, Professor Shapiro teaches courses in corporate financial strategy at the graduate level and corporate finance at the executive level. Professor Shapiro was qualified without objection as an expert in the areas of economics, corporate finance, cost of capital, banking (but not bank regulatory matters), capital markets and valuation.[22]

Professor Shapiro's quantitative model of the "but-for" world took a different approach as compared to Professor Calomiris, relying on strip financing to incorporate a combination of equity and debt financing in March 1989. After determining that equity financing "was a must," he considered various

---

**21.**  In the alternative, in the event the burden is deemed to be on defendant to establish any offset to the value of the equity surrender, the court also holds that Professor Shapiro's model provides a reasonably certain method for making

that determination. See *Caroline Hunt,* 65 Fed. Cl. at 322 (citations omitted).

**22.**  Tr. at 619–21.

forms of equity financing.[23] Acknowledging Mr. Fail's expressed preferences, Professor Shapiro sculpted a model utilizing strip financing to minimize relinquished equity when compared to an all equity financing arrangement.[24]

To calculate the amount of equity surrendered for strip financing, Professor Shapiro examined the three capital infusions that CFSB required of: (1) $35 million at the expiration of the initial bridge loan in March 1989, (2) $25 million in December 1989, and (3) $25 million in December 1990.[25] According to Professor Shapiro's model, the cumulative result of financing all three infusions would have been CFSB's relinquishment of 47.1% of its equity.

The model was divided into three time periods representing the cash infusions that Mr. Fail had used in the actual world. The first period was March 31, 1989 where Professor Shapiro adjusted plaintiffs' actual earnings for the interest and underwriting costs paid on the strip financing security in the "but-for" world. The underwriting cost of 5% was based on "empirical evidence of underwriting costs for convertible issues" which amounted to $1.8 million.[26] Combining this with almost $36 million from the accrued interest at a 13.5% interest rate over three months, the required financing was approximately $37.8 million. After valuing CFSB at $44.7 million, he multiplied that amount by a ratio of 1.0, because it was in the 90th percentile of the market to book value ratios for publicly traded thrifts, which resulted in a book value of $44.7 million.[27] Since $37.8 million in debt needed to be issued, Professor Shapiro used the median rate for a single B-rated financial company of 15.5% so the debt would sell at a discount to face value with an estimated market value of $32.9 million. The market value of the equity at that time was $11.8 million, derived from the market value of CFSB's assets, $44.7 million, minus the market value of its debt, $32.9 million.[28] Of this equity, $4.8 million, which amounted to 41.0% of the equity sold, needed to be given up to compensate for the below market interest rate.[29] While the percentage remained high, the investor that would have loaned CFSB $37.8 million in financing would have only received $4.8 million in equity.

The same calculations administered for March 1989 were also utilized for December 31, 1989. This period, however, had a much lower required contribution due to the assumption that a large dividend would be paid resulting in the cumulative percentage of equity sold increasing by only four-tenths to 41.4%.[30] Administering the same calculations, again, for December 31, 1990, Professor Shapiro assumed a smaller dividend resulting in a higher required financing charge, about $12.3 million, when compared to the financing charge of December 31, 1989, about $1.4 million.[31] The higher amount of external capital required the cumulative percentage of equity sold in the "but-for" world to increase to 47.1%.[32]

Professor Shapiro rationalized this long-term approach because of the risk associated with short-term investments, the documentary evidence showed plaintiffs were seeking long-term financing at the time, plaintiffs initially argued that they would have raised long-term financing at this time, and because of the impending December 1989 deadline.[33] He started his model in March 1989 because plaintiffs initially argued when the bridge loan came due, they were unable to achieve long-term financing in the actual world due to uncertainty in the market over a possible

23. *Id.* at 782; see also *id.* at 787.

24. *Id.* at 787.

25. *Id.* at 805–18.

26. *Id.* at 806.

27. *Id.* at 807–08.

28. *Id.* at 808.

29. *Id.* at 808–09 (explaining that $4.8 million represented the debt and equity financing

amount of nearly $37.8 million minus the debt market value of $32.9 million).

30. *Id.* at 816–17.

31. *Id.* at 817–18.

32. *Id.* at 818.

33. *Id.* at 811.

governmental breach in regard to specific forbearances.[34]  Professor Shapiro also reasoned that it would be appropriate to start his model at that time due to plaintiffs' expert witness, Professor Weil, using March 1989 as the start date for long-term financing.[35]

To determine equity financing costs, Professor Shapiro next calculated the adjusted net income of CFSB in the "but-for" world which differed from the actual world due to different financing costs resulting from a different interest rate, different underwriting expenses, and the availability and use of dividends.[36]  Applying the cumulative percentage of equity sold, 47.1%, to the "but-for" world adjusted net income of CFSB, which was higher than the actual world net income by about $9.5 million, the value of equity sold would have been about $131.8 million.[37]  Subtracting the loss that would have occurred in the "but-for" world from the actual loss, Professor Shapiro concluded that the damages should be $545,219.[38]

Professor Shapiro did provide a modified model, should the "but-for" financing be delayed until December 1989, where the long-term net financing costs would result in damages of $20,692,620.  Alternatively, recognizing this court could adopt Professor Calomiris' model, Professor Shapiro supplied another calculation demonstrating maximum actual and "but-for" financing costs with a resulting damages award of $10,086,565.  This amount, $10,086,565, was also advocated as a jury award verdict.

#### i. *Equity*

When Mr. Fail realized that he would need more than $35 million to acquire the Pard/

Rose Package in 1988, he approached Mr. Shaw to inquire whether he or one of his companies were interested in investing additional funds, which "would involve an equity participation in the transaction."[39]  Mr. Fail continued to search for capital sources willing to invest in Bluebonnet or provide financing in 1989.  *Bluebonnet II*, 47 Fed.Cl. at 162.  To augment his own efforts, Mr. Fail sent Mr. Carneal, Executive Vice President of the Lifeshares Group, Inc., an insurance company owned by Mr. Fail, to meet with potential capital sources and search for investors willing to provide either equity or debt financing.  *Id.* Independently, these pre-breach examples exemplify Mr. Fail's preference, or at a minimum a tolerance, to distribute equity in order to gain financing.  Corroborating an equity relinquishment tolerance, in December 1989 of the breach effected world, Mr. Fail infused $25 million into Bluebonnet through Prime Financial, a company owned by Mr. Fail, from Consolidated National Successor Corporation (CNC), a holding company owned by Mr. Shaw. *Id.* at 163.  In exchange for the capital infusion, among other things, CNC received a right to 9% of the profits of CFSB, or 50% of the net proceeds of a potential sale of Bluebonnet.  See *id.*  While the breaches, especially the dividend forbearance, were a "substantial factor in causing Mr. Fail and CFSB to incur increased financing costs," *id.* at 178, the equity relinquishment further suggests an acceptance, to a degree, of equity financing.  Due to Mr. Fail's constant search for financing prior to the breach that included equity financing, and his decision to concede equity as part of the December 1989 financing, it is reasonably certain that Mr.

---

34.  *Id.* at 812–13.

35.  *Id.* at 813.

36.  *Id.* at 818.

37.  *Id.* at 819.

38.  *Id.*

39.  Defendant's Exhibit 366 (Memorandum from the law firm of Jones, Day, Reavis, and Pogue), Appendix II, pg. 4, ¶ 12:
    When [Mr.] Fail had determined in 1988 that, to effect the Acquisition of the Pard/Rose Package, he would need more than $35,000,000, the amount he had proposed to borrow from a company in which [Mr.] Shaw had an interest, he asked [Mr.] Shaw if he or one of the companies in which he had an interest would be interested in investing additional funds, which would involve an equity participation in the transaction.  [Mr.] Fail was informed that neither [Mr.] Shaw nor any of the companies in which he had an interest had any interest in investing additional funds or acquiring an equity participation and the matter was pursued no further at that time.

Fail would have accepted an offer for equity financing should it have been available in 1989 in the non-breach world. At a minimum, equity financing was a realistic possibility and, therefore, the option of equity financing should not be dismissed.

The conclusion of a required equity surrender is further supported by the risk / return principle and the matching principle as articulated by Professor Shapiro. The risk that Bluebonnet presented its investors could reasonably be seen as high, requiring a higher return in the form of equity. While this court is not making a determination as to the amount of risk presented to the investor, the government's experts did provide a reasonable basis for the possibility of a higher risk.[40] In accordance with the risk / return principle, the higher risk would warrant equity financing. Further, the matching principle, which states that long-term assets are funded with long-term financing, suggests that investors do not usually use short-term loans to finance long-term liabilities.[41] Professor Shapiro illustrated this principle by stating home owners do not finance their home (a long-term asset) with a credit card (short-term loan).[42] Both principles bear on the present case and provide ample support for the application of an equity financing requirement.

In addition, Professor Shapiro's model utilized strip financing which allows the investor to share some of the upside of the investment in exchange for a below market interest rate charged to the issuer. While the investor gains some equity and is not forced to bear a risk without a higher degree of reward, the issuer is not required to produce the same levels of cash that alternative financing arrangements would require.[43] This buttresses

the court's opinion with regard to the preferences of investors for equity financing.

Professor Shapiro's empirical evidence provides additional support for an equity financing requirement. After reviewing similarly structured bank holding companies, he discovered all were financed with equity and the majority were financed with 100% equity.[44] While Mr. Walters attempted to provide similar empirical evidence, the lack of congruence between CFSB and his sample set provides an inadequate basis for requiring equity financing.[45] Although Mr. Walters' empirical evidence does not aid the position of requiring equity financing, it neither hurts it. Professor Shapiro's review of numerous bank holding companies provides adequate support that his "but-for" model is consistent with economic realities.

Expert testimony augments the equity finance requirement in the "but-for" world through the proposition that all-debt financing options would have been limited. While the court finds Mr. Walters largely unpersuasive as to the amount of equity surrender required, see *Westfed Holdings,* 407 F.3d at 1364 (affirming the trial court's decision not to give credit to the government's witnesses because none developed a model for losses in the "but-for" world), the court does give credence to his conclusion that all-debt deals were not available in plaintiffs' marketplace.[46] Reaching a similar conclusion independent of Mr. Walters' remarks, Professor Shapiro constructed a "but-for" model and believed plaintiffs would be unable to fund all of the required capital through "straight debt." [47] The probable limitations on the marketplace concerning debt financing further demonstrates the likelihood of equity financing in the "but-for" world. According-

---

40. See Tr. at 740 (Professor Shapiro explaining that investors would bear equity risk so to attract them, equity would have to be offered); *Id.* at 1231 (Mr. Walters explains that if the thrift were to default then the depositors have priority to recover over the lenders).

41. *Id.* at 684–87.

42. *Id.* at 742–44.

43. *Id.* at 786.

44. *Id.* at 757.

45. Mr. Milton J. Walters was admitted as an expert in investment banking, generally, with certain caveats in U.S. Government regulations, tax attributes of thrift-related transactions, and financial accounting of thrift-related transactions. See *id.* at 1182–87.

46. *Id.* at 1224.

47. *Id.* at 730.

ly, the court holds that equity financing "was a must" in the "but-for" world.[48]

### ii. *Long–Term Financing*

Mr. Fail's preference for long-term financing has been firmly established. Mr. Fail testified that he wanted a long-term loan as early as December 30, 1988 when signing the loan agreement with Bankers Life and when the loan was due in three months.[49] While Mr. Fail desired long-term financing, it would not be entered into at all costs. For this reason, when presented with the opportunity to obtain long-term financing in the breach effected world, Mr. Fail declined because of a desire for more favorable terms.[50] Mr. Fail continued his search for long-term financing in 1990 when he, again, approached Mr. Shaw to discuss possibilities to raise capital. *Bluebonnet II*, 47 Fed.Cl. at 178 (explaining that "plaintiffs sought permanent financing from Mr. Shaw to cover the 1990 infusion and refinance the 1988 and 1989 loans"). Although unsuccessful in both instances, the events display a preference for long-term financing by Mr. Fail during the period utilized in Professor Shapiro's model.

It is likely that investors, the source of the million dollar loans, would also have preferred long-term financing in the non-breach effected world. While plaintiffs advocate that lower interest rates would be available on shorter term loans, which defendant's expert, Professor Shapiro, agrees, the lender would desire the loan paid off at the end of the shorter period.[51] CFSB, however, did not have the capital to make such a payment and would therefore have to roll over the loan with the lender, if the lender permitted this action, or find a different lender to assume another loan. Both alternatives suggest that Professor Shapiro's model utilizing long-term equity financing for added consideration to the lender is not only plausible,

but probable.[52] Such financing is consistent with the long-term equity financing options presented by Professor Shapiro. See also *Bluebonnet III*, 266 F.3d at 1358 ("The Court of Federal Claims correctly found that without long-term financing for [the initial $35 million] loan, it was highly unlikely that willing investors would have been found for the capital infusions."). This view is consistent with the aforementioned risk / return principle and matching principle. According to the risk / return principle, the investors would have desired a long-term equity financed loan due to the high amount of risk associated with the thrift. The matching principle also lends support as the long-term liability should be financed with a long-term loan. Consistent with the court's impression, Mr. Valeo, plaintiffs' previous expert, opined that he could have located investors to raise $50 million, provided the initial $35 million be long-term financed. *Bluebonnet II*, 47 Fed. Cl. at 182.

While plaintiffs point to the loans in the breach effected world that were debt-based and short-term to suggest a similar loan structure would be utilized in the "but-for" world, long-term loans were preferred by Mr. Fail and in the "but-for" world would have been viable options due to a lower credit risk for CFSB, capital markets being available, and the accessibility of common stock dividends. The court previously agreed with plaintiffs' experts and held that "the breaches increased the credit risk of CFSB and Mr. Fail." *Id.* at 176. Conversely, in the non-breach world, plaintiffs would be a better credit risk than in the actual world. Additionally, absent the breach, the capital markets would have been open to thrifts attempting to acquire long-term financing. *Id.* at 176–77 ("The court accepts Mr. Valeo's and Mr. Plank's opinion that the breaches caused plaintiffs' inability to obtain financing

---

**48.** See *id.* at 782 (Professor Shapiro testifying: "Equity financing was a must. Nobody was going to bear these risks[,] all these risks just on a straight debt basis.").

**49.** Transcript of First Damages Trial (1Tr.) at 1011–12; see also *Bluebonnet II*, 47 Fed.Cl. at 172 ("An attachment to Mr. Carneal's December 21, 1988 letter to Mr. Berg stated that the proposed loan would be *long-term*, but the details of

the loan were still being negotiated." (emphasis added)).

**50.** 1Tr. at 1011–12.

**51.** Tr. at 684, 686–87.

**52.** See *id.* at 687.

outside of Mr. Shaw and his companies."); accord *Glendale Fed. Bank, FSB v. United States,* 43 Fed.Cl. 390, 402 (1999) (finding that after the passage of FIRREA the capital markets generally were closed to thrifts), *aff'd in part,* 239 F.3d 1374 (2001).

The court previously adopted plaintiffs' view that dividends were important to CFSB and investors. *Bluebonnet II,* 47 Fed.Cl. at 177. The "continual denial of requests to distribute common stock dividends had direct consequences upon CFSB and Mr. Fail." *Id.* at 178. Should dividends have been available, then plaintiffs would not have been forced to finance through Mr. Shaw who "was in a better bargaining position and took advantage of Mr. Fail's breach-imposed condition." *Id.* Exemplifying the importance and relationship between dividends and long-term financing, in a letter to Mr. Fail, Mr. Shaw wrote, " 'the demonstration of a predictable dividend flow' from Bluebonnet was the most important element in providing permanent financing to plaintiffs." *Id.* (quoting Plaintiffs' Exhibit 171). Absent the breach, plaintiffs would have had access to a stream of dividends attracting more long-term financing suitors at more attractable terms.

The inversion of these three characteristics of plaintiffs' breach effected world suggests that long-term financing would have been available from more sources at more attractable terms.[53] While this court maintains a right to review its previous decisions as the application of the law of the case doctrine is "discretionary with regard to prior trial-level determinations of an issue," the court finds that the previous holdings provide plausible evidence to suggest the availability of long-term financing in the "but-for" world. *LaSalle Talman,* 64 Fed.Cl. at 97.

Counter to the pattern of Mr. Fail seeking long-term financing options, Professor Calomiris maintains that while long-term financing would have been available in 1989, plaintiffs would have chosen short-term financing because it was more desirable.[54] Professor Calomiris also contends that plaintiffs would have kept a "hand on the pulse of the market" which would have allowed them to take advantage of the favorable long-term rates apparent in 1992.[55] The long-term financing market rates, however, rose just after February 1990, then decreased in August 1990, only to rise again in December 1990, peaking after December 1990, then subsequently falling.[56] Mr. Fail could not have accurately known when the specific rise and fall of the market would occur,[57] especially considering the volatility of the market.

In contrast to Professor Calomiris' exceptional market forecasting abilities, Mr. Walters testified that it is "very difficult to predict the future from one day to the next."[58] Professor Shapiro concurred, stating that no one can predict the short and long-term financing rates.[59] As Professor Shapiro remarked, "We wouldn't be sitting here in court and Mr. Fail wouldn't be running his thrift, he would be managing his interest rate sensitive portfolio" if he could predict these rates.[60] If the experts who have invested countless dedicated hours are unable to accurately predict the long-term financing market rates, then the court cannot see how Mr. Fail could.

During the hearing, Professor Calomiris suffered a self-inflicted wound when he contradicted a basic premise underlying his model. Countering his own position that plaintiffs preferred long-term financing, Pro-

---

**53.** See also *id.* at 395–96 (Professor Calomiris remarking: "but for the breach, they would have had better options. Those would have included long-term financing.").

**54.** *Id.* at 394 (Professor Calomiris responding to a question regarding the availability of long-term financing prior to 1992: "It was available. That doesn't mean it was desirable.").

**55.** *Id.* at 155.

**56.** *Id.* at 435–37.

**57.** *Id.* at 437.

**58.** *Id.* at 1245.

**59.** *Id.* at 680.

**60.** *Id.;* see also Defendant's Post Trial Brief at 8–9 ("If plaintiffs could actually predict the movement of interest rates, they could have amassed such profound wealth that owning a thrift in Texas would have been an unnecessary distraction." (citation omitted)).

fessor Calomiris stated: "[plaintiffs] were hoping to get long-term financing but the breach put them in a position where they don't get the financing that they were hoping for ...."[61] Acknowledging plaintiffs' preferences for long-term financing effectively undermines the assumption that plaintiffs would necessarily issue subordinated debt at the end of 1992.

In light of the evidence that shows Mr. Fail contemplated and preferred long-term financing as early as 1988, coupled with the likely availability of long-term financing options in the "but-for" world and Professor Calomiris' candid admission regarding plaintiffs' long-term financing preferences, it is reasonably certain that in the non-breach world the long-term financing terms would have been more attractive and more available due to less lingering doubt over the passage of FIRREA and Mr. Fail would have seized the opportunity.

### iii. Timing—March 1989

Plaintiffs maintain that Professor Shapiro's model is incorrect due to its start date of March 1989. Alternatively, Professor Calomiris' model starts in 1992 as he and plaintiffs read the Federal Circuit to require such a date, which the court has determined was not a requirement.

Indeed it was plaintiffs' previous position, as articulated by Professor Weil, that the model should be constructed prior to 1992.[62] Professor Weil's model comparing the "but-for" and actual worlds began in 1988 and continued through 1997. Comparing the costs to Mr. Fail and CFSB, it is clear that Professor Weil traced the effect of the breach back to 1988.[63] Plaintiffs aver that the court rejected Professor Weil's model on the basis that the model did not provide a reasonable estimation of the "but-for" world. The court, however, ruled Professor Weil's model was improper due to a lack of evidence establishing that anyone would have lent the

required capital infusions at Professor Weil's assumed 13.5% rate. See *Bluebonnet II*, 47 Fed.Cl. at 182; *Bluebonnet III*, 266 F.3d at 1358 ("The court correctly noted that there was no evidence presented that anyone would have loaned CFSB the funds required for the capital infusions at 13.5%."). In addition, the Federal Circuit, affirmed this court's conclusion that "without long-term financing for this loan, it was highly unlikely that willing investors would have been found for the capital infusions." *Bluebonnet III*, 266 F.3d at 1358. The court's rejection of plaintiffs' model on these grounds does not preclude a finding at this stage of the litigation that Mr. Valeo's assumption regarding the effects of the breach on CFSB, Mr. Fail and other thrifts prior to the passage of FIRREA, is reasonably certain.

Professor Shapiro built upon Professor Weil's findings to create a model initiated in March 1989. As previously stated, Professor Shapiro started his model at this time because he believed it was appropriate due to the investment's risk, the documentary evidence suggested that plaintiffs were actively seeking long-term financing at this time, plaintiffs previously argued they intended to raise long-term financing at that time, and due to the December 1989 deadline.[64] Specifically, Professor Shapiro recalled that plaintiffs previously argued that when the bridge loan came due in March 1989, they were unable to secure long-term financing, claiming there was a "cloud of uncertainty over the market that suggested that the government was likely to breach the specific forbearances that would otherwise give it access to the capital markets."[65] It was also Professor Shapiro's understanding that Professor Weil developed his "but-for" world to begin on March 31, 1989.[66]

Initially, Professor Shapiro narrowed the start date to both March 1989 and December 1989. He reasoned that if he started in December 1989, the long-term financing envi-

---

61. Tr. at 397.

62. See PX 290.

63. Compare PX 290 RLW–1, RLW–2 with RLW–4, RLW–5.

64. Tr. at 811.

65. *Id.* at 812–13.

66. *Id.* at 813–16.

ronment would have been worse for plaintiffs, shown by issue volume "drying up" and rising interest rates.[67] Since Professor Weil had previously initiated plaintiffs' model in March 1989 and December 1989 was "a terrible time in which to arrange long-term financ[ing]," Professor Shapiro settled on March 1989 as the starting date for his "but-for" model.[68]

The court previously accepted a damages model for lost profits, commencing in July 1989, a date prior to the enactment of FIRREA and its implementing regulations. See *Commercial Fed.*, 59 Fed.Cl. at 350. The court noted that the thrift "became aware of FIRREA's impending enactment in early 1989 and its intention to pursue a shrink strategy is noted in the minutes of a meeting . . . on July 5, 1989." *Id.* at 343. The plaintiff proffered a damages model, which the court analytically dissected into three distinct time periods. In pertinent part, the plaintiff's expert "assume[d] that, but for the breach, plaintiff would have been able to grow its assets at an annual rate of 10 percent from July 1989 to June 1994 and that those assets would have produced an average return of one percent for the period." *Id.* at 344. The court credited

> the foresight of the . . . committee, which determined in advance of FIRREA's enactment, that the most prudent response to the uncertainties of FIRREA's implementation was the shrink strategy. Due to that strategy, by the time FIRREA was implemented plaintiff had a core capital ratio of 3.01 percent without supervisory goodwill, or slightly above the regulatory minimum.

*Id.* at 347. Therefore, the court held that "during the period July 1989 to June 1994, the breaching provision of FIRREA resulted in lost profits of $5,602,000." *Id.* at 350.

*Commercial Fed.* is analogous to the case before the court. Both cases involved institutions which experienced or recognized the affects of FIRREA prior to August 1989. In *Commercial Fed.*, the plaintiff's expert estab-

lished that, by shrinking in size prior to FIRREA's enactment, the thrift suffered lost profits. See *id.* In the case at bar, as mentioned above, Mr. Valeo, plaintiffs' expert at the first damages trial, testified that the impending enactment of FIRREA created "enormous uncertainty in the capital markets which caused the markets to lose interest in thrift issued securities." *Bluebonnet II,* 47 Fed.Cl. at 174 n. 78 (citing 1 Tr. at 2678–79). Stated another way, the "pre-breach chill" [69] unfavorably impacted plaintiffs' financing costs. As in *Commercial Fed.*, the harm in this case extended to a pre-FIRREA timeframe. Therefore, the court finds that Professor Shapiro's reliance on the March 1989 date, *i.e.*, the inclusion of a pre-FIRREA component in his "but-for" damages model, is reasonably certain.

In view of all the evidence, compelling testimony, persuasive models, plaintiffs' preferences, and the *Commercial Fed.* decision, the court finds merit in Professor Shapiro's start date of March 1989. Factually, long-term financing initiated on March 31, 1989 is reasonably certain and consistent with plaintiffs' previous damages model that was rejected on other grounds.

### iv. *Thrift Financial Reports v. Audited Financial Statements*

Plaintiffs maintain that Professor Shapiro's model is unreliable because he relied upon audited financial statements as opposed to thrift financial reports (TFRs). Plaintiffs aver that the TFRs reveal that the equity surrender contained within Professor Shapiro's "but-for" model in March 1989 would have been significantly lower. Plaintiffs, therefore, conclude that Professor Shapiro's model should have begun in December 1989. Plaintiffs allege that making this correction to Professor Shapiro's damages model increases damages to between approximately $76 and $81 million. Plaintiffs contend that "[l]ess than one hour into his cross-examination, [Professor] Shapiro disavowed the conclusions of his original model." [70]

---

67. *Id.* at 813.

68. *Id.*

69. Plaintiffs' Post–Hearing Reply Brief at 5.

70. Plaintiffs' Post–Hearing Opening Brief at 38 (citing Tr. at 884).

Conversely, defendant maintains that Professor Shapiro did not disavow the parameters and conclusions in his model. Defendant contends that neither the audited financial statements nor the TFRs would have been available to an investor in March 1989. Defendant asserts, however, that the projected earnings in plaintiffs' business plan are comparable to the figures in the audited financial statements thereby confirming Professor Shapiro's reliance on them. Defendant also avers that the TFRs could not be trusted because they were questionable in their content. The court agrees with defendant.

As an initial matter, Professor Shapiro directly indicated at trial, in response to questioning from plaintiffs' counsel: "I am not disavowing my model." [71] While Professor Shapiro indicated that he should have looked at the TFRs when constructing his model, he ultimately concluded that the existence of the TFRs did not alter his conclusion. [72] Contrary to plaintiffs' assertion, therefore, Professor Shapiro's model is still intact. Next, there are several reasons proffered by Professor Shapiro for relying on the audited financial statements which the court finds credible. There is no disagreement that neither the TFRs nor the audited financial statements were available in March 1989. It is also clear in this case, however, that audited financial statements form the more reliable basis upon which to construct a "but-for" damages model. The figures contained in the audited financial statements were consistent with the projected earnings in plaintiffs' business plan, [73] and were also consistent with an October 1989 Office of Thrift Supervision Report of Examination. [74]

The TFRs, on the other hand, were more problematic. For instance, in a regulatory plan dated September 30, 1989, regulators stated:

Books and Records. This area is viewed with concern. The Institution's books and records are not accurate nor are they prepared in a timely manner. The Thrift Financial Report for the month January 1989 is still reported as "In Error" rather than "Clean" as are all subsequent reports. [75]

Apart from the regulators' concerns, Professor Shapiro testified that a prospective investor would not have relied on the TFR's earning figure for the March 1989 quarter. [76] According to that TFR, there were "$299,000 in earnings on an asset base of over $3 billion." [77] Professor Shapiro testified: "[t]hat comes out to less than [1/100th] of 1 percent return on assets, which is absolutely insignificant." [78] An investor either would have abandoned the deal in its entirety or would have "[dug] deeper and [found] out what was going on and look[ed] at the earnings forecast ...." [79] Therefore, the court finds no fault with Professor Shapiro's utilization of audited financial statements, the contents of which were corroborated by the thrift's projected earnings and the regulatory examination.

v. *Errors*

Plaintiffs contend that four errors exist as to Professor Shapiro's model. The first error concerns Professor Shapiro's assumption that CFSB would have retired Mr. Fail's debt for free. Plaintiffs aver that the underlying assumption that CFSB would diminish its equity value to payoff Mr. Fail's 1988 personal loan without receiving an offsetting asset is unreasonable. Defendant maintains, citing Professor Shapiro's testimony, that the informal consolidation of CFSB and Mr. Fail's liabilities demonstrates the economic effect, not the legal effect, of the "but-for" world financing model. In addition, defendant contends that, as a matter of economics, the informal consolidation makes no differ-

71. Tr. at 884.

72. *Id.* at 1011, 1056.

73. PX 37, at 2–3; Tr. at 1057–60.

74. PX 144, at 12; see also Tr. at 1120–21.

75. PX 135, at 4.

76. Tr. at 1060–61.

77. *Id.* at 1060.

78. *Id.*

79. *Id.* at 1061.

ence because the end result was the same—plaintiffs were financing the equity/stock in Bluebonnet.[80]

While Professor Shapiro contends that "CFSB is really the alter ego of Mr. Fail," the court is concerned with the law and not merely an economic view.[81] Professor Shapiro acknowledges that CFSB is a "legally separate entity" from Mr. Fail, but treats both of them as one unit.[82] Professor Calomiris avoided this dilemma by creating Stone Holdings in the "but-for" world to consolidate Mr. Fail's debt and his ownership of CFSB.[83] The court must acknowledge the legal walls erected between Mr. Fail and CFSB. Legal distinctions serve a vital importance to the legal and economic infrastructure of the American economic markets and entities will be treated as to how they are legally formed until such time the judicial system rules otherwise.

Because in March 1989, 12 C.F.R. § 584.6(a) would have kept CFSB from "assum[ing] any debt" without prior approval from the FHLBB, it is highly unlikely that CFSB would have been permitted to freely accept Mr. Fail's personal debt. 12 C.F.R. § 584.6(a) (1989). The restrictions would not have applied if the issuance of debt was less than 15% of the consolidated net worth of CFSB, but since CFSB was seeking to raise $35 million, which was in excess of the 15%, the restrictions would have applied.[84] See *id.* Because plaintiffs' suggested alternative

of CFSB receiving a note payable from Mr. Fail in return for assuming his debt is reasonable and would have likely been accepted by the FHLBB, in the event that acceptance was required, their correction is adopted. This correction reduces the equity surrender of Professor Shapiro's model from 47.1% to 16.1%, resulting in plaintiffs' damages increasing to $96,798,842.[85]

In the event that the terms "significant equity" are determined not to be limited to the EBA, the court finds that 16.1% equity relinquishment is not significant. The 16.1% equity relinquishment, however, is consistent with the court's previously explained view regarding the necessary surrender of equity in the "but-for" world. The drastic reduction of equity surrendered is primarily due to the increased amount of equity that CFSB would possess due to the note payable.[86] According to Professor Shapiro's model, CFSB had a required return due to the frozen "B" rating. If the firm did not possess a substantial amount of equity, then a higher percentage of equity would have to be surrendered. The application of the note payable adjustment, however, increases equity resulting in a lesser amount of equity needed to be relinquished for financing in the "but-for" world.[87] A table comparing Professor Shapiro's unedited model with the error correction advocated by Professor Calomiris illustrates the effect of the receipt of a note payable from Mr. Fail to CFSB:

| | Equity (rounded to nearest million) | Cumulative Equity Surrender | Total Damages |
|---|---|---|---|
| Professor Shapiro's Unedited Model | $12,000,000 | 47.1% | $10,086,565 |
| Professor Shapiro's Model With CFSB Receiving A Note Payable From Mr. Fail | $45,000,000 | 16.1% | $96,798,842 |

**80.** *Id.* at 736–39.

**81.** *Id.* at 737.

**82.** *Id.*

**83.** For purposes of this analysis, the court accepts Professor Calomiris' creation of Stone Holdings in 1989 in a "mechanical sense." *Bluebonnet Sav. Bank, FSB v. United States,* 52 Fed.Cl. 75, 77 (2002) (unpublished) (*Bluebonnet*

*IV*) ("The court is constrained by the mandate of the Federal Circuit."), *vacated and remanded,* 339 F.3d 1341 (2003). See *id.* at 367–68.

**84.** See also *id.* at 1027–28.

**85.** *Id.* at 358–60.

**86.** *Id.*

**87.** See *id.*

Plaintiffs' remaining contentions are unavailing. Plaintiffs aver that Professor Shapiro's model treated dividends both as a cost of financing and a source of financing. The court is unpersuaded by the logic plaintiffs assert concerning the treatment of dividends. Professor Shapiro, due to a large dividend payment in the "but-for" world in December 1989, reduced the financing charges.[88] Consistent with plaintiffs' prior arguments, Professor Shapiro used dividends in the "but-for" world to effectively reduce the amount of capital required.[89] The court finds Professor Shapiro's model to accurately portray dividends. Plaintiffs also maintain that Professor Shapiro assumed artificial CFSB loan and market interest rate demands which forced an equity surrender. Professor Shapiro, however, arrived at a 12% rate because it was comparable to other "B" rated institutions which the court finds reasonable and persuasive. Plaintiffs aver that defendant ignored Professor Calomiris' alternative calculation of long-term rates based on straight debt not linked to an equity kicker. The court, however, believes that some equity was required and finds plaintiffs' argument without merit.

### Conclusion

*Bluebonnet* has been a fixture on this court's docket for approximately ten years. Over this time span, the court has held: (1) a six-week trial on damages, (2) a two-day hearing involving testimony from Professor Merton Miller, an economist and joint recipient of the Nobel Memorial Prize in Economic Science in 1990, and (3) a six-day hearing to ascertain "but-for" costs; reviewed thousands of pages of expert testimony and reports; examined elaborate economic theories and data; entertained numerous substantive motions; perused extensive briefs submitted by both parties; and had the opportunity to first-hand gauge the credibility of the witnesses who testified in this matter. The court has indeed, to borrow the Federal Circuit's language, gained an "intimate familiarity with the facts" of this case. *Bluebonnet V,* 339 F.3d at 1346. Ten years, however, is a very long time and "the court has ...

endeavored to deal as best as it can with the problems posed by the passage of time and the magnitude and complexity of the contract and the government's breach." *Glendale,* 43 Fed.Cl. at 410; see also *Bluebonnet V,* 339 F.3d at 1346 (describing "the complexity of the case"). Nevertheless, the court recognizes that it "is in the best position to make the necessary findings on [the] complex issue" before it. *Bluebonnet V,* 339 F.3d at 1346.

There is no doubt that plaintiffs in this case were harmed. *Id.* While recognizing that damages need not be calculated with "absolute exactness or mathematical precision," *Bluebonnet III,* 266 F.3d at 1355, the court kept in mind, in reaching its conclusion, that it should place plaintiffs in "as good a position as [they] would have been in had the contract been performed," Restatement (Second) of Contracts § 344(a), while simultaneously not allowing plaintiffs "to achieve a position superior to the one it would reasonably have occupied had the breach not occurred." *LaSalle Talman,* 317 F.3d at 1371. After digesting the voluminous record before it, the court "occupie[d] the position of a jury under like circumstances," *Bluebonnet III,* 266 F.3d at 1357 (citations omitted), and exercised its "best judgment upon the basis of the evidence provided by the parties," *id.,* to reach a damages award consistent with the above principles. Accordingly, in light of these principles, the court, in its own judgment and while "occup[ying] the position of a jury," *id.,* is confident that under a jury verdict analysis the $96,798,842 figure represents a "fair and reasonable approximation" of damages, *id.,* and adequately assesses "the net financial effect of the breach." *Bluebonnet V,* 339 F.3d at 1346.

For the above-stated reasons, the Clerk of the Court is hereby directed to enter judgment in favor of plaintiff James M. Fail in the amount of $96,798,842. No costs.

IT IS SO ORDERED.

---

**88.** See *id.* at 816–17.

**89.** *Id.* at 795–96.